# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01173-SCT

*REGGIE ELLIOTT, BRENDA EJIMOFOR, AS CO-ADMINISTRATOR AND CO-ADMINISTRATRIX OF THE ESTATE OF JOE ELLIOTT, DECEASED: ORLANDO ELLIOTT, FRANKIE MITCHELL, AS CO-GUARDIANS OF OLANDREA ELLIOTT, A MINOR; MICHAEL ELLIOTT AND ALMA ELLIOTT*

*v.*

*EL PASO CORPORATION, TENNESSEE GAS & PIPELINE COMPANY AND CHEVRON PHILLIPS CHEMICAL COMPANY, LP*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/19/2013 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| TRIAL COURT ATTORNEYS: | JAY M. ATKINS |
| | H. CASE EMBRY |
| | CASEY L. LOTT |
| | KEN F. FITZGERALD |
| | ORLANDO R. RICHMOND, SR. |
| | CHRISTY D. JONES |
| | MICHAEL E. McWILLIAMS |
| | MARK A. DREHER |
| | WARREN HORN |
| | DREW R. BALLINA |
| | HEATHER CHEESBRO |
| | MICHAEL J. TARLETON |
| | BRETT A. SCHUBERT |
| | PATRICK GAREIS |
| | J. JEFFREY TROTTER |
| | BERNARD H. BOOTH, IV |
| | JASON M. ZAGER |
| | PAUL A. WILLIAMS |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |

ATTORNEYS FOR APPELLANTS:  CASEY L. LOTT
JESSE MITCHELL, III
KEN F. FITZGERALD
BARBRAE LUNDBERG

ATTORNEYS FOR APPELLEES:  ORLANDO RODRIQUEZ RICHMOND, SR
CHRISTY D. JONES
MICHAEL E. McWILLIAMS
MARK ALAN DREHER
JOHN JEFFREY TROTTER
BERNARD H. BOOTH, IV
JASON M. ZAGER
PAUL A. WILLIAMS

NATURE OF THE CASE:  CIVIL - WRONGFUL DEATH

DISPOSITION:  AFFIRMED IN PART, REVERSED IN PART, AND RENDERED - 09/03/2015

MOTION FOR REHEARING FILED:

MANDATE ISSUED:

## CONSOLIDATED WITH

## NO. 2013-IA-01338-SCT

*TRI-STATE METER AND REGULATOR SERVICE, INC.*

*v.*

*REGGIE ELLIOTT AND BRENDA EJIMOFOR AS CO-ADMINISTRATOR AND CO-ADMINISTRATRIX OF THE ESTATE OF JOE ELLIOTT, DECEASED, ORLANDO ELLIOTT AND FRANKIE MITCHELL AS CO-GUARDIANS OF OLANDREA ELLIOT, A MINOR, MICHAEL ELLIOTT AND ALMA ELLIOTT, CHEVRON PHILLIPS CHEMICAL COMPANY, LP AND ALLSTATE INSURANCE COMPANY*

DATE OF JUDGMENT:  07/19/2013
TRIAL JUDGE:  HON. ANDREW K. HOWORTH
COURT FROM WHICH APPEALED:  MARSHALL COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:  JAY MARSHALL ATKINS
H. CASE EMBRY

2

ATTORNEYS FOR APPELLEES:          CASEY L. LOTT
                                  JESSE MITCHELL, III
                                  KEN F. FITZGERALD
                                  BARBRAE LUNDBERG

NATURE OF THE CASE:               WRONGFUL DEATH
DISPOSITION:                      AFFIRMED IN PART, REVERSED IN PART,
                                  AND RENDERED - 09/03/2015

MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE DICKINSON, P.J., PIERCE AND COLEMAN, JJ.**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     A city pipeline buried beneath a road leaked odorless natural gas which infiltrated a nearby home, causing an explosion.    Residents—who were not natural gas customers—alleged that the natural gas lacked its distinctive rotten egg smell, and that the odorant that is designed to provide the warning odor was defective because it faded.  After reviewing Plaintiffs' products-liability and assorted negligence claims against the odorant manufacturer, odorant distributor, and transmission pipeline, we conclude that these claims fail as a matter of law.  We affirm the circuit court's grant of summary judgment to the odorant manufacturer and transmission pipeline, and we reverse the circuit court's denial of the odorant distributor's motion for summary judgment and render judgment in its favor.

## FACTS AND PROCEDURAL HISTORY

¶2.     On April 8, 2008, Joe and Alma Elliott's home in Holly Springs, Mississippi, caught fire, which started in Joe and Alma's bedroom near a propane heater, and quickly spread to the ceiling, prompting the Elliotts to evacuate.  As Joe, Alma, their grandson Michael, and their infant granddaughter Olandrea—whom Michael was carrying—tried to escape through

3

the front door, the house exploded, killing Joe and seriously injuring Alma, Michael, and Olandrea.

¶3.    When the fire started, the Elliotts' home was filled with high levels either of propane or natural gas.  But neither Alma nor Michael recalled smelling natural gas or propane gas before the explosion.  The Elliotts had a propane gas tank that supplied propane heaters throughout their home.  And although the Elliotts did not use or purchase natural gas, the Holly Springs Utility Department maintained an odorized natural gas distribution pipeline running underneath Cuba Street in front of their home.

¶4.    The morning after the explosion, an investigator noticed "some bubbling coming out of [a] crack in the [Cuba Street] asphalt," about "60 to 70 feet away from the house."  The utility department later determined that its natural gas pipeline underneath Cuba Street was fractured.  And soil tests revealed the presence of natural gas in the Elliotts' front yard.

¶5.    The smell associated with natural gas—which is odorless, tasteless, and colorless—actually comes from an odorant that is added for safety purposes.  Natural-gas pipeline distributors are required by federal regulation to inject this odorant, usually a mercaptan-based odorant, into natural gas so people can smell a gas leak.[1]  Of course, the odorant works as an effective warning device only when people actually smell it. The Elliotts' expert believes the fractured pipeline allowed natural gas to infiltrate their home and

---

[1]"A combustible gas in a distribution line must contain a natural odorant or to be odrized so that at a concentration in air of one-fifth of the lower explosive limit, the gas is readily detectable by a person with a normal sense of smell." 49 C.F.R. § 192.625(a).  The plaintiffs point out that Congress required natural gas companies to add odorant to natural gas as the result of a 1937 school explosion in New London, Texas.

that a phenomenon known as odorant fade explains why the Elliotts did not smell the odorant in the natural gas.

¶6.     All natural gas odorants can fade for various reasons, making the presence of natural gas impossible to detect.  Odorant fade can occur as a result of oxidation or adsorption when odorized natural gas migrates through soil.[2]  So the Elliotts' expert theorizes that natural gas odorant fade occurred when the fugitive natural gas migrated underneath the Elliotts' front yard.

¶7.     Following the explosion, the Elliotts sued the Holly Springs Utility Department ("HSUD") under the Mississippi Tort Claims Act,[3] Tennessee Gas Pipeline and its parent company El Paso Corporation ("TGP"), Tri-State Meter and Regulator Service, Inc. ("Tri-State"), Chevron Phillips Chemical Company, LP ("CPChem"), who was joined as a defendant in March 2012 in Plaintiffs' Fifth Amended Complaint, and Amerigas Propane, LP, who Plaintiffs freely admit has been joined as a defendant only to avoid an "empty chair defense at trial."  This case involves only the Elliotts' claims against CPChem, Tri-State, and TGP.  The plaintiffs have settled their claims against the utility department.

---

[2] Adsorption occurs when the soil physically removes odorant from gas.  Oxidation is the chemical process whereby mercaptan odorants are converted into a disulfide with a less pungent odor.

[3] Unfortunately, the Elliotts did not have the benefit of this Court's recent clarification of discretionary-function immunity when they settled their claims against HSUD for a nominal amount.  *See **Brantley v. City of Horn Lake**,* 152 So. 3d 1106, 1115 (Miss. 2014) ("[A] plaintiff may defeat sovereign immunity, even when a governmental entity's act furthered a discretionary function or duty, when the plaintiff proves that the act also furthered a more narrow function or duty which is made ministerial by another specific statute, ordinance, or regulation promulgated pursuant to lawful authority.").

5

¶8. CPChem manufactures odorant, including the Scentinal S-20 odorant used by the utility department. Tri-State, a regional distributor of CPChem's odorant, sells Scentinal S-20 odorant to the utility department, which also contracts with Tri-State to help it prepare its required public education program and provide natural-gas training to its employees. TGP operates an interstate natural-gas pipeline network, which transports deodorized natural gas to a transfer point on the outskirts of Holly Springs, known as the "city gate" junction, which is several miles from the Elliotts' home. The deodorized natural gas is then transferred to the utility department's distribution pipeline, where the utility department injects Scentinal S-20 odorant into the natural gas before transmitting the gas to its customers.

¶9. The Elliotts have asserted negligence, strict liability, and products liability claims against CPChem, TGP, and Tri-State. They seek recovery of damages caused by odorant fade and punitive damages. The Elliotts argue that all defendants had a duty to warn the affected public about the dangers of odorant fade and the need for the affected public to utilize in-home gas detectors.

¶10. CPChem, Tri-State, and TGP filed motions for summary judgment in the circuit court. The circuit court, without elaboration, granted CPChem's and TGP's motions for summary judgment but denied those filed by Tri-State and Amerigas. The Elliotts appealed the summary judgments, and we granted Tri-State's petition for permission to file an interlocutory appeal of the trial court's denial of summary judgment. We then consolidated the cases.

**ANALYSIS**

6

¶11. The issue presented is whether CPChem, Tri-State, and TGP, or any of them, are entitled to summary judgment. We review a trial court's grant or denial of a motion for summary judgment de novo, viewing all material facts and inferences in the light most favorable to the nonmovant.[4] Where, as here, the nonmovant is the plaintiff who bears the burden of proof at trial, the nonmovant must produce "supportive evidence of *significant* and *probative* value" to avoid summary judgment.[5] If the nonmovant fails in this task, and there are no genuine issues of material fact, summary judgment should be granted as a matter of law.[6]

¶12. Bearing in mind these standards, we now analyze the Elliotts' negligence and strict-liability-based claims, products-liability claims, and punitive-damages claims to determine whether there are any genuine issues of material fact that preclude summary judgment.

## I. Plaintiffs' negligence and strict-liability claims fail as a matter of law.

¶13. The Elliotts have asserted numerous negligence and strict-liability claims against CPChem, Tri-State, and TGP, most of which are for damages caused by odorant fade, although the Elliotts allege that Tri-State also was negligent in failing to train the utility department about odorant fade and in negligently drafting the utility department's public-

---

[4] *Conrod v. Holder*, 825 So. 2d 16, 18 (Miss. 2002) (citing *Daniels v. GNB, Inc.*, 629 So. 2d 595, 599 (Miss. 1993)).

[5] *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1355 (Miss. 1990) (citing *Fruchter v. Lynch Oil Co.*, 522 So. 2d 195, 198 (Miss. 1988) (emphasis original)).

[6] *Conrod*, 825 So. 2d at 18 (citing *Daniels*, 629 So. 2d at 599).

awareness program and including information about odorant fade. Still, odorant fade is a recurring theme in all of these claims.

### A. The MPLA provides the framework for analyzing plaintiffs' negligence and strict-liability claims based on odorant fade.

¶14. To properly analyze the Elliotts' negligence and strict-liability claims, we must look to the Mississippi Products Liability Act (MPLA) that applies "in *any* action for damages caused by a product,"[7] with deviation defects,[8] warnings or instruction defects,[9] design defects,[10] and where a product breached an express warranty.[11] Subsection (a)(i)-(iii) establishes the plaintiff's prima facie elements in this case.[12]

¶15. In interpreting and applying the MPLA, we have explained that "the MPLA provides the exclusive remedy" for products-liability claims,[13] and "since [the enactment of the MPLA], products-liability claims have been specifically governed by statute, and a claimant, in presenting his case, must pay close attention to the elements of the cause of action and the liability limitations enumerated in the statute."[14] In other words, the MPLA has abrogated

---

[7] Miss. Code Ann. § 11-1-63 (Rev. 2014).

[8] *Id.* at § 11-1-63(a)(i)(1).

[9] *Id.* at § 11-1-63(a)(i)(2).

[10] *Id.* at § 11-1-63(a)(i)(3).

[11] *Id.* at § 11-1-63(a)(i)(4).

[12] *Id.* at §§ 11-1-63(a)(i)-(iii).

[13] *Lawson v. Honeywell Int'l, Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011) (citing Miss. Code Ann. § 11-1-63 (Rev. 2002)).

[14] *Williams v. Bennett*, 921 So. 2d 1269, 1273 (Miss. 2006).

products-liability claims based on strict-liability or negligence theories, and the MPLA now provides the roadmap for such claims.[15]

¶16.    Plaintiffs, citing language from *O'Flynn v. Owens-Corning Fiberglass*,[16] repeat throughout their brief that "[u]nder Mississippi law, victims of defective products with inadequate warnings may bring negligence actions—separate and apart from claims under the MPLA—against the responsible parties, although courts have applied what is essentially a negligence analysis in MPLA failure to warn cases."  We read *O'Flynn* and the MPLA differently.

¶17.    The Court of Appeals in *O'Flynn* specifically stated that "[s]ince O'Flynn and Hatten filed their complaints before [the MPLA became law], the Mississippi Products Liability Act is inapplicable."[17]  The Court of Appeals—applying pre-MPLA law—explained that a products-liability suit "'may be based on the theory of negligence or strict liability in tort.'"[18] But, as noted above, this Court has held that the MPLA is the exclusive remedy for claims brought after its enactment.[19]

---

[15] *Id.*

[16] *O'Flynn v. Owens-Corning Fiberglass*, 759 So. 2d 526, 534–35 (Miss. Ct. App. 2000).

[17] *Id.* at 534.

[18] *Id.* at 535 (quoting Bobby Marzie Harges, *An Evaluation of the Mississippi Products Liability Act of 1993*, 63 Miss. L.J. 697, 718–19 (1994)).

[19] *Lawson*, 75 So. 3d at 1027.

¶18.    Plaintiffs also cite **R.J. Reynolds Tobacco Co. v. King**,[20] and **Watson Quality Ford, Inc. v. Casanova**,[21] to support their theory that "[t]his Court has explicitly acknowledged that Plaintiffs may bring failure to warn claims founded upon both negligence and product liability theories."  But in **King**, we simply stated the obvious: the MPLA "precludes all tobacco cases *based upon products liability*, not *all* tobacco cases, which could be based on other possible theories of recovery."[22]  And in **Casanova**, we noted that there was "no statutory requirement that makes the MPLA the exclusive remedy for claims of malfunctioning automobiles."[23]

¶19.    A negligence claim alleging failure to warn, train, educate, or draft a warning plan about the dangers of odorant fade and the need for gas detectors indeed is a claim *based upon products liability,* and such a claim must be analyzed under the MPLA.  If the plaintiffs in this case had alleged negligence claims against the manufacturer and seller that were unrelated to the odorant's alleged defects—for instance, fraud, misrepresentation, or breach of the implied warranty of merchantability—then the MPLA would not have applied and common-law principles would have controlled.[24]  But all of Plaintiffs' negligence or strict-

---

[20] **R.J. Reynolds Tobacco Co. v. King**, 921 So. 2d 268, 272 (Miss. 2005).

[21] **Watson Quality Ford, Inc. v. Casanova**, 999 So. 2d 830, 833 (Miss. 2008).

[22] **King**, 921 So. 2d at 272.

[23] **Casanova**, 999 So. 2d at 833.

[24] We note that, under the current version of the MPLA, the MPLA applies "in any action for damages caused by a product, including, but not limited to, any action based on a theory of strict liability in tort, negligence or breach of implied warranty . . . ." Miss. Code Ann. § 11-1-63 (Rev. 2014).  So, in a case involving a product defect, even a claim for breach of an implied warranty would seem to be subsumed by the MPLA.

liability claims are based on the damages purportedly caused by alleged defects in the odorant, so we must analyze those claims under the MPLA.[25]

¶20. In short, Plaintiffs' negligence and strict-liability-based products-liability claims against CPChem, Tri-State, and TGP must be analyzed under the MPLA. To the extent that Plaintiffs purport to make common-law negligence or strict-liability claims based on damages caused by odorant fade, we find that those claims fail as a matter of law.

### B. Plaintiffs' other negligence claims against TGP fail.

¶21. Plaintiffs also claim that TGP was negligent by breaching a statutory and common-law duty to warn about odorant fade and the availability of gas detectors. We find no evidence in the record that TGP committed any tortious act, so Plaintiffs' claims against TGP likewise fail.

¶22. In order to recover in a negligence case, "a plaintiff must prove by a preponderance of the evidence (1) duty, (2) breach, (3) causation, and (4) injury,"[26] which also requires proof of "causation in fact and proximate cause."[27]

> We have observed that in order for a person to be liable for an act which causes injury, "the act must be of such character, and done in such a situation,

---

[25] Miss. Code Ann. § 11-1-63 ("[The MPLA applies] in any action for damages caused by a product . . . .").

[26] *Gulledge v. Shaw*, 880 So. 2d 288, 292–93 (Miss. 2004) (citing *Miss. Dep't of Transp. v. Cargile*, 847 So. 2d 258, 262 (Miss. 2003), *overruled on other grounds by Little v. Miss. Dep't of Transp.*, 129 So. 3d 132, 138 (Miss. 2013)).

[27] *Gulledge*, 880 So. 2d at 293 (citing *Jackson v. Swinney*, 244 Miss. 117, 123, 140 So. 2d 555, 557 (1962)).

11

that the person doing it should reasonably have anticipated that some injury to another will probably result therefrom."[28]

We also have held that "remote possibilities do not constitute negligence from the judicial standpoint."[29]

¶23.    Plaintiffs allege that TGP had both a statutory and common-law duty to warn about odorant fade and the need for gas detectors.  But neither the federal statute nor the federal regulation cited by Plaintiffs imposes a duty to warn upon a natural-gas pipeline company that transports gas across the country.  And, with respect to a natural-gas transporter who merely transports natural gas for a fee, we find no precedent for any alleged duty to warn.

¶24.    Under 49 U.S.C. Section 60116, the "owner or operator of a gas or hazardous liquid pipeline facility" must carry out a public-education program, encouraging the public to "call before you dig" and offering other advice about precautions to take in the event of an emergency.  This statute does not require a pipeline transmission company to warn about possible odorant fade or the availability of gas detectors.  Similarly, under 49 C.F.R. Section 192.616(a), a pipeline operator is required to carry out public education.  This regulation does not require a pipeline transmission company to warn about possible odorant fade or the availability of gas detectors.  Indeed, an expert in federal pipeline regulations testified that no federal regulations require TGP to warn about odorant fade or the need for gas detectors.

---

[28] *Gulledge*, 880 So. 2d at 293 (quoting *Mauney v. Gulf Ref. Co.*, 193 Miss. 421, 9 So. 2d 780, 780–81 (1942)).

[29] *Gulledge*, 880 So. 2d at 293 (quoting *Ill. Cent. R. Co. v. Bloodworth*, 166 Miss. 602, 145 So. 333, 336 (1933)).

12

¶25.    But, even assuming the existence of a duty to warn in this case, there is no evidence that TGP's alleged breach of that duty proximately caused the harm suffered by Plaintiffs. TGP simply transported natural gas through a transmission pipe located several miles from Plaintiffs' home to the utility department's distribution pipeline. TGP did not maintain the pipeline underneath Cuba Street. And TGP did not sell odorant or inject odorant into the HSUD's natural gas. Without proof of causation, Plaintiffs' negligence claims against TGP fail as a matter of law.[30]

## II.    Plaintiffs' MPLA claims fail as a matter of law.

¶26.    Plaintiffs also have asserted numerous products-liability claims against CPChem, Tri-State, and TGP. The MPLA provides the exclusive remedy "in any action for damages caused by a product" against a product manufacturer or seller.[31] Neither party disputes that CPChem is a "manufacturer" and that Tri-State is a "seller." However, Plaintiffs also argue that TGP is liable under the MPLA as a "seller, distributor[,] or common carrier of natural gas (no matter which shoe fits)." We disagree.

---

[30] See *Casanova*, 999 So. 2d at 835 (quoting *Rolison v. City of Meridian*, 691 So. 2d 440, 444 (Miss. 1997)) ("It is elementary that '[t]he elements of proof required to support a claim for damages for negligence are a duty, a breach of that duty, damages, and proximate cause.'").

[31] Miss. Code Ann. § 11-1-63(a); *Lawson*, 75 So. 3d at 1027, 1029 (holding that MPLA applied only to claims against manufacturers and sellers and did not apply to claims against nonmanufacturing product designer). In 2014, the Legislature amended Section 11-1-63 to bring product-liability claims against "designers" under the MPLA.

¶27. Any claim Plaintiffs have against TGP is governed by common law, as discussed above, and not the MPLA.[32] TGP does not manufacture or sell odorant; it merely transports natural gas through its pipelines from producers to purchasers and receives a fee pursuant to a federal tariff. The MPLA, by its very terms, does not provide a cause of action against a common carrier that merely transports another company's product from a manufacturer to a seller.[33]

¶28. Despite the language in the MPLA limiting products-liability claims to manufacturers and sellers, Plaintiffs urge us to follow *Menschik v. Mid-America Pipeline Co.*, a Missouri Court of Appeals case in which the court found that a natural-gas-transmission-pipeline company was an odorant "seller."[34] However, the court in *Menschik* clearly explained that "Mid-America [not] only transported and stored the unodorized gas, but it placed the gas-with-odorant—the product which would in due course be placed in use by the consumer—in the stream of commerce."[35] And "Mid-America's participatory connection with the injury-producing product, for its personal profit, makes it responsible under modern products liability theory for the injury caused to the unwary consumer who is injured by the product."[36]

---

[32] *See Lawson*, 75 So. 3d at 1030 ("We hold that the MPLA does not preclude common-law negligence claims against nonmanufacturing designers who do not fall under the purview of the statute.").

[33] Miss. Code Ann. § 11-1-63(a).

[34] *Menschik v. Mid-America Pipeline Co.*, 812 S.W.2d 861, 863-64 (Mo. Ct. App. 1991).

[35] *Menschik*, 812 S.W.2d at 863.

[36] *Id.* at 863–64 (citing *Gunderson v. Sani-Kem Corp.*, 674 S.W.2d 665, 668 (Mo. Ct. App. 1984)).

¶29. Even if we agreed with the Missouri Court of Appeals that such liability was warranted under the MPLA, *Menschik* would not support holding TGP liable in this case, because TGP did not odorize the utility department's natural gas. Since any MPLA claim asserted against TGP fails as a matter of law, we will analyze only plaintiffs' MPLA claims against CPChem and Tri-State.

¶30. Plaintiffs argue that the odorant CPChem manufactured and Tri-State sold was defective for two reasons. First, they say the odorant was designed in a defective manner, and second, that the odorant was defective because it failed to contain adequate warnings or instructions. We will analyze the merits of each claim separately.

### A. Plaintiffs' design-defect claims fail because Plaintiffs have offered no proof of a feasible alternative odorant design.

¶31. In a design-defect claim under the MPLA, the plaintiff must prove, by the preponderance of the evidence, that "the product was designed in a defective manner,"[37] that "[t]he defective condition rendered the product unreasonably dangerous to the user or consumer,"[38] and that "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."[39] The statute further provides that

> [a] product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that

---

[37] Miss. Code Ann. § 11-1-63(a)(i)(3).

[38] *Id.* at § 11-1-63(a)(ii).

[39] *Id.* at § 11-1-63(a)(iii).

15

cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.[40]

Additionally, a plaintiff making a design-defect claim must prove by the preponderance of the evidence the existence of a feasible design alternative:

> The product failed to function as expected and *there existed a feasible design alternative that would have to a reasonable probability prevented the harm*. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.[41]

¶32.　We find that Plaintiffs' design-defect claims fail as a matter of law because no expert has offered any alternative chemical design for the allegedly defective odorant. Instead, Plaintiffs' alternative design for odorant—requiring members of the affected public to buy gas detectors—is an additional warning system.

¶33.　This Court has stated that "demonstrating a feasible alterative design as proof of a design defect is elemental to a claimant's prima facie case."[42] In **Williams**, we found that a plaintiff who alleged that a handgun was defective "failed to provide the circuit court with any basis of comparison from which to determine that the design of the Lorcin handgun was indeed defective."[43] And "[f]atal to Williams's case is that Williams's expert tenders no proof

---

[40] Miss. Code Ann. § 11-1-63(b).

[41] Miss. Code Ann. § 11-1-63(f)(ii) (emphasis added).

[42] **Williams v. Bennett**, 921 So. 2d 1269, 1275 (Miss. 2006).

[43] **Id.**

of a feasible design alternative that could have, to a reasonable probability, prevented the harm."[44]

¶34.    Likewise, in *3M Co. v. Johnson*, this Court held that a plaintiff's claim that a dust mask was defective for failing to reduce exposure to asbestos failed because the plaintiffs' expert failed to offer proof of a "feasible design alternative to the 8710 disposable respirator which could have been used."[45]  And in *Clark v. Brass Eagle, Inc.*, we affirmed summary judgment in a design-defect case in which a paintball-gun owner alleged that the manufacturer should have provided goggles, because the plaintiff "offered no feasible design alternative which, to a reasonable probability, would have prevented what happened to him."[46]

¶35.    In this case, Plaintiffs offered no evidence of a feasible alternative design which, to a reasonable probability, would have prevented the explosion.  Robert Stubbs, Plaintiffs' expert, readily conceded that a different odorant would not "have made a difference in this case," and that Scentinal S-20 was actually a good odorant and should not have been removed from the market.

¶36.    Dr. Kenneth Laughery, another expert for Plaintiffs, also stated that he would not be offering testimony regarding an alternative odorant design, "unless you consider warnings to be part of the design of the product . . . ."  And, although David Buddingh testified at

---

[44] *Id.*

[45] *3M Co. v. Johnson*, 895 So. 2d 151, 165 (Miss. 2005).

[46] *Clark v. Brass Eagle, Inc.*, 866 So. 2d 456, 461 (Miss. 2004).

17

length about the usefulness and desirability of in-home gas detectors, he never suggested that gas detectors were an alterative design for natural-gas odorant. Rather, he testified that utility companies should provide the public with gas detectors.

¶37.    Plaintiffs argue in their brief that "[a]n alternative design does exist that would not impair the odorant's usefulness or desirability. CP[Chem] and Tri-State could require the retailers of their product, the gas utility companies, to require the affected public in their distribution areas to use gas detectors in their homes." Again, we disagree.

¶38.    Under the MPLA, a plaintiff must prove that there is "a feasible alterative design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers."[47] Requiring an entirely different warning system, or requiring the affected public to use gas detectors in their homes, is not a feasible alternative design for natural-gas odorant. What Plaintiffs are proposing is a new natural-gas warning system. So Plaintiffs' design-defect claims against CPChem and Tri-State fail because Plaintiffs have offered no proof of a feasible alternative odorant design.

### B.    Plaintiffs' failure-to-warn claims also fail because the Elliotts cannot prove that "ordinary users or consumers" of odorant did not realize the potential for odorant fade.

¶39.    At the outset, we recognize that Plaintiffs' failure-to-warn claims raise serious public-policy concerns about the fallibility of natural gas odorants and the dangers of an odorant-based natural-gas warning system. But such public-policy considerations are for the

---

[47] Miss. Code Ann. § 11-1-63(f)(ii) (emphasis added).

18

Legislature, not the courts.[48] We find that Plaintiffs' failure-to-warn claims are barred by the MPLA because they cannot prove that the "ordinary users or consumers" of natural-gas odorant did not realize the potential for odorant fade.[49]

¶40.    In a failure-to-warn case, a plaintiff must show by the preponderance of the evidence that "[t]he product was defective because it failed to contain adequate warnings or instructions,"[50] "[t]he defective condition rendered the product unreasonably dangerous to the user or consumer,"[51] and "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."[52]

¶41.    The MPLA provides a manufacturer or seller with a defense to liability in a failure-to-warn claim:

> In any action alleging that a product is defective because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable *if the claimant does not prove by the preponderance of the evidence* that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that

---

[48] ***Lawson***, 75 So. 3d at 1027 (citing ***Russell v. State***, 231 Miss. 176, 94 So. 2d 916, 917 (1957)) ("The function of the Court is not to decide what a statute should provide, but to determine what it does provide.").

[49] Miss. Code Ann. § 11-1-63(c)(i); ***Lawson***, 75 So. 3d at 1027 (citing ***Clark v. State ex rel. Miss. State Med. Ass'n***, 381 So. 2d 1046, 1048 (Miss. 1980)) ("If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction.").

[50] Miss. Code Ann. § 11-1-63(a)(i)(2).

[51] *Id.* at § 11-1-63(a)(ii).

[52] *Id.* at § 11-1-63(a)(iii).

cause the damage for which recovery is sought and *that the ordinary user or consumer would not realize its dangerous condition.*[53]

And the MPLA further defines the term "adequate product warning or instruction" as a warning that a reasonably prudent manufacturer or seller would give to an ordinary consumer who purchases the product:

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to *an ordinary consumer who purchases the product* . . . .[54]

¶42. All agree that the Elliotts were not ordinary natural-gas-odorant consumers or even natural-gas purchasers. In a failure-to-warn claim under the MPLA, the plaintiff must prove by the preponderance of the evidence both that (1) "at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought,"[55] and (2) "that the ordinary user or consumer would not realize its dangerous condition."[56] If the plaintiff fails to prove both, the "manufacturer or seller shall not be liable . . . ."[57]

---

[53] *Id.* at § 11-1-63(c)(i).

[54] *Id.* at § 11-1-63(c)(ii).

[55] *Id.* at § 11-1-63(c)(i).

[56] *Id.*

[57] *Id.*

¶43.   For purposes of opposing CPChem's and Tri-State's motion for summary judgment, Plaintiffs have offered sufficient proof that both defendants knew about odorant fade. However, both CPChem and Tri-State are entitled to summary judgment on Plaintiffs' failure-to-warn claims because the Elliotts have provided no evidence that the Holly Springs Utility Department—or any other "ordinary users or consumers" of natural gas odorant—was unaware of the potential for odorant fade.[58]  Under the MPLA, a manufacturer or seller is not liable for failure to warn unless the plaintiff can prove that the "ordinary user or consumer" of the allegedly defective product did not know of the danger it posed.[59]

¶44.   The "ordinary users or consumers" of natural-gas odorant are utility and pipeline companies—not the general public—who inject the odorant into natural gas to give natural gas its distinctive "rotten egg smell."  And, even more importantly, it is undisputed that the Elliotts were not "ordinary users or consumers" of natural gas.

¶45.   In short, the Elliotts were not "ordinary users or consumers" of odorized natural gas and their claims against the odorant manufacturer and odorant seller for failure to warn are barred by the MPLA.[60]  So we find that both CPChem and Tri-State were entitled to summary judgment on Plaintiffs' failure-to-warn claims.

### III.    Plaintiffs' punitive-damages claims fail as a matter of law.

---

[58] *Id.*; ***Karpinsky v. Am. Nat'l Ins. Co.***, 109 So. 3d 84, 89 (Miss. 2013) ("[Plaintiff] carries the burden of *producing* sufficient evidence of the essential elements of her claim at the summary-judgment stage, as she would carry the burden of production at trial.").

[59] *Id.*

[60] *Id.*

¶46. It is axiomatic that "[p]unitive damages do not exist in a vacuum. Absent a valid claim for compensatory damages, there can be no claim for punitive damages."[61] Because we find that Plaintiffs' underlying claims fail as a matter of law, we also find that Plaintiffs' punitive-damages claims fail.

## CONCLUSION

¶47. We find that the Elliotts' claims against CPChem, Tri-State, and TGP fail as a matter of law. We affirm the circuit court's grant of summary judgment on Plaintiffs' claims against CPChem and TGP. We reverse the circuit court's denial of summary judgment to Tri-State and we render judgment in Tri-State's favor dismissing Plaintiffs' claims.

¶48. **AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.**

**WALLER, C.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., NOT PARTICIPATING.**

---

[61] *Nix*, 142 So. 3d at 392 (citing Miss. Code Ann. § 11-1-65(1)(b)&(c)).