# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01184-COA

**STACEY DAVIS**                                                              **APPELLANT**

**v.**

**JAMES LESLIE HENDERSON**                                                  **APPELLEE**

DATE OF JUDGMENT:                06/04/2019
TRIAL JUDGE:                     HON. ROBERT GEORGE CLARK III
COURT FROM WHICH APPEALED:       MADISON COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:         PAUL E. ROGERS
                                 MARY CATHERINE WILLIAMS
ATTORNEY FOR APPELLEE:           JAMES LESLIE HENDERSON (PRO SE)
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     REVERSED, RENDERED, AND
                                 REMANDED - 09/29/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1. Upon a husband and wife's divorce, the wife was granted sole physical custody of the couple's two children, and the husband was ordered to pay child support for both children. The husband later sought to terminate his child-support obligations for one of the children. The chancery court granted the request and reduced his child-support obligations by half. The chancery court also found the wife in contempt for failure to comply with court-ordered counseling sessions. The wife now appeals the chancery court's child-support and contempt findings.

### FACTS

¶2.     James "Jim" Henderson and Stacey Davis had two sons during their marriage: L.S.H. and C.R.H.[1]  When the couple divorced, Stacey was granted sole custody of both children, and Jim was awarded visitation.  Twelve years after the custody determination, Jim filed a petition for emergency relief.  The chancery court entered a temporary order awarding Jim sole legal and physical custody of L.S.H. for the purpose of admitting him into an in-patient treatment facility.  The court also suspended Jim's child-support obligation by half, to $1,000 per month.

¶3.     A year later, L.S.H. was returned to Stacey's custody, and Jim's full child-support obligations were reinstated.  The chancery court ordered Stacey and Jim to "enter into individual weekly counseling sessions with [a counselor] for the purpose of learning to co-parent and communicate with one another."  A subsequent in camera status conference was held with only the chancellor and the parties' attorneys present.  During the conference, the court verbally ordered that Stacey and Jim were to follow the counselor's recommendations. No written order followed the verbal order.

¶4.     Following the status conference, the counselor recommended that the children participate in parental reunification counseling with Jim.  The counselor testified that Stacey did bring C.R.H. to a counseling session and made an appointment for L.S.H.  On the day of L.S.H.'s appointment, Stacey arrived without him and informed the counselor that L.S.H. would not be attending the parental reunification counseling because she did not believe the children were under a court order to do so.  However, she did state her intention to continue

---

[1] We use initials to protect the identities of minors.

with the co-parenting counseling.

¶5.     Jim filed a motion for contempt for Stacey's alleged failure to participate in the court-ordered co-parenting classes and her alleged interference with Jim's visitation rights.[2]  In his motion, Jim sought for Stacey to be found in civil and criminal contempt of court.  He requested that Stacey be fined an amount not exceeding $5,000 for each separate incident of contempt and incarcerated for a term not exceeding six months for each separate incident of contempt.

¶6.     A hearing on the motion was held on the matter, and the chancery court found that "Stacey unilaterally stopped attending the sessions and refused to allow the minors to participate in sessions with Jim[.]"  During the year and a half between the status conference and the contempt hearing, Stacey had only attended three co-parenting counseling sessions. The court accordingly held Stacey "in contempt for her failure to timely participate in co-parenting counseling, unilaterally stopping the sessions, and preventing the minors from participating in parental reunification counseling with their father."  Stacey was ordered to be "incarcerated in the Madison County Detention Center for ten (10) days," with six days suspended and "four (4) days shall be served[,] . . . [to] pay a fine to the Madison County Chancery Clerk in the amount of $2,000.00[,]" and to pay Jim's attorney fees "in the amount of $3,085.00."

¶7.     Jim also filed a motion to terminate his child-support obligations to C.R.H on the ground that "C.R.H.'s total abandonment of his father-son relationship with Jim is clear and

---

[2] Throughout their legal dispute, Jim filed numerous contempt actions against Stacey. His sixth motion for contempt is the subject of this appeal.

extreme, and justifies a forfeiture of Jim's financial obligations for the benefit of C.R.H."

He argued that C.R.H. had refused to have any contact with him for over three years and

would not answer Jim's phone calls or text messages.

¶8.	At the hearing on the matter, C.R.H. testified his father "has done things that make

me not want to see him." He described Jim as abusive and recounted an incident when Jim

forced the thirteen-year-old boy to hold up his hands against the wall "for a very long

extended period of time" until he was in pain and crying. C.R.H. testified that on that same

night, his father pinned his twelve-year-old brother against the wall by his neck, leaving hand

marks.

¶9.	When L.S.H. returned to school after his visitation with Jim, the school counselor

questioned him about the marks on his neck. The counselor then filed a report with the

Mississippi Department of Human Services (DHS), which initiated an investigation.[3] The

DHS investigation substantiated the allegations of child abuse. The matter was then referred

to the youth court. However, the youth court declined to hear the case because there was a

pending action in the chancery court. C.R.H. also stated that his stepmother was abusive as

well. He testified that "when we were younger, if we did anything that she saw as unfit, she

would either slap us or pull our hair."

¶10.	C.R.H. testified that Jim's controlling behavior was one of the reasons he no longer

---

[3] During his testimony, L.S.H. gave his version of the events. He stated, "My dad had—he held me on the ground. He was slapping me in the face. And, obviously I was squirming around so he was hitting me on the neck and face in just kind of that general area." Both L.S.H. and C.R.H. testified that the school reported the marks on L.S.H.'s neck to DHS, which initiated an investigation.

wanted to have visitation with his father. When visiting Jim, C.R.H. was not allowed to close his bedroom door or go outside and play in the yard. Instead, C.R.H. said he was "required to always stay in the front foyer of the house where [he could] be easily observed." Jim would normally take C.R.H.'s phone away from him to restrict the boy's communication with his mother. He also would not give him the password to access the internet. Also, even though C.R.H. loved to cook, he was not allowed to do so at Jim's house. Because Jim and his wife only cooked "occasionally," the family primarily ate "[e]ither fast food or some easy homemade meal."

¶11.    C.R.H. is fearful of his father. He stated at trial, "I am afraid that if I try to have any sort of normal relationship with me [sic], I might end up in a very scary situation that I might not be able to get out of." When asked for an example of what he was referring to, C.R.H. responded, "How my brother was held had at my dad's house for two to three months and was forcefully [taken] out of school and only fed fast food and gained weight and was restricted from seeing his friends or anything of that sort."

¶12.    C.R.H. testified that he does love his father on "some level" but is not interested in having an ongoing relationship with him. C.R.H.'s largest and most frequently repeated complaint about Jim is that "[i]n general he is not very interested in what I do or my future." He explained, "Going to college and getting a job and going to graduate school after college are a big thing that my father seems very neglectful in, participating in, or helping or assisting in." Jim did not go to any of C.R.H's football games and only attended two of his band performances, one being several years prior when he was in sixth grade.

5

¶13. C.R.H. said that he could not think of anything that he could do with his dad to improve their relationship, but he also expressed a desire for his father to "[s]how some regard for [C.R.H.'s] future and [can] show active interest in what [C.R.H. is] participating in." He also said he would be more inclined to respond to Jim's text messages if he were to "strike a meaningful conversation" rather than "[j]ust, 'Hello . . . and [sending] random pictures."

¶14. The chancery court found that "the failure for visitation between the minors and Jim primarily lies with the minors' desire not to see their father." The chancery court ruled "that the actions of the minors are clear and extreme enough to warrant a temporary suspension of child support until such time as all parents and all children participate in co-parenting and reunification counseling." It further ruled that "Jim's obligation to pay child support . . . [was] temporarily suspended until such time as Jim, Stacey, L.S.H., and C.R.H. . . . participated in co-parenting and parental reunification counseling[.]"

¶15. A year later, the chancery court issued its final judgment and granted Jim's request to terminate his financial obligation to C.R.H. The court held that "C.R.H.'s hostility towards his father and his abandonment of the father-son relationship constitute[d] clear and extreme conduct, and warrant[ed] the termination of Jim's obligation to pay child support for C.R.H." It further held that "Jim's child support obligation for C.R.H. [was] terminated, until such time as C.R.H. [] resumed his regular visitation with [Jim] on a consistent basis and a viable father-son relationship exists between C.R.H. and Jim." The court found that L.S.H. had some relationship with his father and reinstated Jim's child-support obligation to

him. Jim's child-support obligation for the children was reduced by half, to $1,000 per month.

¶16. Aggrieved by the chancery court's finding of contempt, termination of child support, and modification of child-support, Stacey now appeals.

## DISCUSSION

¶17. Stacey argues that the chancery court erred by finding her in criminal contempt and by terminating Jim's child-support obligation to C.R.H.

> **I. The chancery court erred by finding Stacey in constructive criminal contempt.**

¶18. The chancery court found Stacey "in contempt for her failure to timely participate in co-parenting counseling, unilaterally stopping the sessions, and preventing the minors from participating in parental reunification counseling with their father" in violation of the court's filed and bench orders. We look first to how the finding of contempt was classified and then to the two orders that Stacey allegedly violated.

> **A. The chancery court erred in its classification of contempt.**

¶19. "When reviewing a chancellor's contempt finding, we first determine whether the contempt is civil or criminal." *Hayes v. Hayes*, 281 So. 3d 1002, 1008 (¶22) (Miss. Ct. App. 2019) (quoting *Hanshaw v. Hanshaw*, 55 So. 3d 143, 147 (¶12) (Miss. 2011)). "[I]n undertaking this task, this Court focuses on the purpose for which the contempt power was exercised." *C.W. v. Lamar County*, 250 So. 3d 1248, 1255 (¶26) (Miss. 2018). "In other words, the determination should focus on the character of the sanction itself and not the intent of the court imposing the sanction." *Id*. (internal quotation mark omitted).

7

¶20. "If the primary purpose of the contempt order is to enforce the rights of private-party litigants or enforce compliance with a court order, then the contempt is civil." *Id*. at 1256 (¶27). "The contemnor may be jailed or fined for civil contempt." *Id*. However, orders imposing a jail sentence are usually indefinite and not for a fixed term. *Jones v. Hargrove*, 516 So. 2d 1354, 1357 (Miss. 1987). Rather, such orders "classically provide for termination of the contemnor's sentence upon purging himself of the contempt." *Id*. "Consequently, it is said that the contemnor 'carries the key to his cell in his own pocket.'" *Id*.

¶21. "Criminal contempt penalties, on the other hand, are designed to punish the contemnor for disobedience of a court order; punishment is for past offenses and does not terminate upon compliance with the court order." *Lamar County*, 250 So. 3d at 1256 (¶26). "What is more, in criminal contempt, the court is the aggrieved party, so the fine is paid to the court." *Id*.

¶22. Here, the purpose of the contempt was to punish Stacey for her past actions of failing "to timely participate in co-parenting counseling, unilaterally stopping the session, and preventing the minors from participating in parental reunification counseling with their father." It was not "intended to compel compliance with an order, admonition, or instruction, but rather as punishment for past offenses." *Id*. at (¶29).

¶23. For her violations, the court ordered Stacey's incarceration for ten days. The chancery court had the option to order Stacey's incarceration until such time as she was prepared to make an appointment and participate in the court-ordered counseling. Instead, the chancery court ordered Stacey to be incarcerated for a defined period of time without a way to purge

8

herself of the contempt. In other words, Stacey did not carry "the key to [her] cell in [her] own pocket."

¶24. Lastly, Stacey was ordered to pay $2,000 as a fine directly to the chancery court itself, not to a private litigant. Taken together, the evidence in the record reflects that the chancery court's unclassified citation of contempt was actually a citation of criminal contempt.

¶25. "But the analysis does not end there," as the Supreme Court has explained, "The next determination to be made is whether the criminal contempt was constructive or direct." *Id*. at 1257 (¶32). "Direct contempt occurs in the presence of the court and may be dealt with immediately." *Hayes*, 281 So. 3d at 1008 (¶23) (quoting *Dennis v. Dennis*, 824 So. 2d 604, 608) (¶10) (Miss. 2002)). "Constructive contempt involves actions which are committed outside the presence of the court." *Id*. at (¶24).

¶26. The alleged contemptuous act—failure to participate in court-ordered counseling— occurred outside the presence of the chancery court. Therefore, this is a case of constructive criminal contempt.

¶27. Classifying the type of contempt is critical, because it sets the burden of proof at trial. "The burden of proof in criminal contempt shall be proof beyond a reasonable doubt." Miss. Code Ann. § 11-51-11(4) (Rev. 2019). We now turn to the merits of the contempt findings.

### B.     The bench order was overly vague and ambiguous.

¶28. The chancery court found Stacey in contempt of two different orders. The first was a filed order that required Stacey and Jim to "enter into individual weekly counseling sessions with [a counselor] for the purpose of learning to co-parent and communicate with

9

one another." Each party was responsible for "setting up an appointment as soon as possible[.]" The second order was a bench order issued during an in camera status conference between the chancellor and the party's attorneys. The bench order was never filed.

¶29. "A party may not be held in contempt for failure to comply with an order that is too vague or ambiguous to be understood." Deborah H. Bell, *Bell on Mississippi Family Law* § 14.05[2][c], at 491 (2d ed. 2011). "[I]f the judgment or decree giving rise to the contempt action is overly vague or nonspecific, a finding of contempt is improper." *Smith v. Mull*, 250 So. 3d 1271, 1274 (¶9) (Miss. Ct. App. 2017). This Court has made clear that "the judgment must be complete within itself leaving open no matter or description or designation out of which contention may arise as to meaning." *Davis v. Davis*, 829 So. 2d 712, 714 (¶9) (Miss. Ct. App. 2002) (quoting *Wing v. Wing*, 549 So. 2d 944, 947 (Miss. 1989)). "Orders from courts, whether oral or written, should not be so vague as to prevent a reasonable person from understanding its clear legal effect or the potential for contempt in failing to abide by its terms." *Lindsay v. Lindsay*, No. 2018-CA-00370-COA, 2020 WL 1685273, at *7 (¶27) (Miss. Ct. App. Apr. 7, 2020), *reh'g denied* (July 21, 2020).

¶30. The chancery court found Stacey in contempt for violation of its bench order by preventing the minor children from participating in parental-reunification counseling with their father. However, the bench order's only directive was that Stacy and Jim follow the counselor's recommendations. It did not specify that the children were to participate in parental-reunification counseling, nor did the order mandate any requirements for the

children at all. As a result, the bench order was "overly vague" as it did not specify the terms which Stacey was to abide by. Accordingly, we reverse and render any contempt based upon the unwritten bench order.

¶31. On the other hand, the filed order was more defined than the unwritten order. The order required the parties to enter into weekly counseling sessions "as soon as possible." Stacey provided an array of excuses for not beginning counseling "as soon as possible." However, the fact of the matter is that she waited three months from the time the order was entered to begin counseling. This certainly raises factual issues if her compliance was "as soon as possible" from the entry of the order. Further, the order required her to attend weekly counseling. From the time the order was entered to the date of the contempt hearing, Stacey had only attended three counseling sessions. For these reasons, we find that in this instance there appears to be an evidentiary basis for the chancery court to have found Stacey in contempt for violating the filed order, but we do not address this issue because the contempt order is reversed for other reasons.

¶32. However, because the chancery court addressed both the bench and filed orders together, we cannot separate them. Because it was "overly vague," we reverse and render any contempt based upon the unwritten bench order. We reverse and remand for the chancery court to decide whether Stacey should be held in civil contempt for her violation of the written order exclusively.

## II. The chancery court erred by terminating Jim's child-support obligations to C.R.H.

¶33. Stacey contends that the chancery court erred when it terminated Jim's child-support

obligation to C.R.H. "[C]hild support is a matter within the discretion of the [chancery court,] and we will not reverse that determination unless the [chancery court] was manifestly wrong in [its] findings of fact or manifestly abused his discretion." *Gillespie v. Gillespie*, 594 So. 2d 620, 622 (Miss. 1992).

¶34. "The duty of parents to support financially, as well as otherwise, their minor children is engrained in our law." *Hackler v. Hackler*, 296 So. 3d 773, 779 (¶44) (Miss. Ct. App. 2020). "Both parents are obligated to provide financially for their children." *Id*.; *see* Miss. Code Ann. § 93-13-1 (Rev. 2018).

¶35. "[C]hancellors should be reluctant to enter orders that do not require a non-custodial parent to pay an appropriate amount of child support, and such orders should be entered only in rare circumstances." *Chroniger v. Chroniger*, 914 So. 2d 311, 316 (¶17) (Miss. Ct. App. 2005) (internal quotation marks omitted). "The chancellor must additionally include detailed findings when entering an order denying child support from a noncustodial parent." *Id*. (citing *White v. White*, 722 So. 2d 731, 737 (¶41) (Miss. 1998) ("This Court has consistently required chancellors to justify any departure from the statutory guidelines when setting child support awards in a detailed, written findings of fact and conclusions of law")).

¶36. "The amount of money that the noncustodial parent is required to pay for the support of his minor children should not be determined by the amount of love the children show toward that parent." *Caldwell v. Caldwell*, 579 So. 2d 543, 548 (Miss. 1991). "Under Mississippi law, a child generally will not forfeit support from a non-custodial parent unless his or her actions toward the parent are clear and extreme." *Lowrey v. Simmons*, 186 So. 3d

907, 915 (¶23) (Miss. Ct. App. 2015) (internal quotation mark omitted).

¶37.    The case of *Roberts v. Brown* provides an example of such "clear and extreme" conduct justifying termination of child-support.  805 So. 2d 649 (Miss. Ct. App. 2002). There, an eighteen-year-old daughter falsely accused her father of rape, of which he was later acquitted.  Additionally, the daughter had refused to visit her father for five years and stated that she had no interest in having a relationship with him.  *Id*. at 651 (¶9).  The Court reversed and rendered the chancery court's decision and terminated the father's child-support obligation.  *Id*. at 674 (¶20).

¶38.    This Court previously reversed a chancery court's decision to terminate a father's child-support obligations to his daughter because their estrangement was "in large measure of [the father's] own making."  *Lowrey*, 186 So. 3d at 917 (¶26).  The Court remanded the issue for further consideration even though the daughter initiated the estrangement and "spurned [the father's] efforts during the course of [the] litigation to pursue joint counseling and reconciliation."  *Id*. at 914-15 (¶¶16, 20).  The Court found that the father had "exacerbated the alienation between him and [the daughter] by not insisting upon his visitation and making little effort to contact his daughter."  *Id*. at (¶17).  The Court held that "[w]here a father's own neglect is the proximate cause of the erosion of his relationship with his child, the child's resistance to belated efforts to reconcile will not relieve the father of obligations of support and to pay college expenses[.]" *Id*. at 917 (¶26).

¶39.    In another case, our Supreme Court held that a child's "current refusal to see or speak to [a support obligor] is not the type of clear and extreme conduct" which warrants

13

termination of child-support." *Dennis v. Dennis*, 234 So. 3d 371, 378 (¶24) (Miss. 2017). There, a step-great-grandfather was obligated to pay child-support for his step-great-grandson. *Id*. at 373 (¶4). It was undisputed that the child was unwilling to have a relationship with his step-great-grandfather. *Id*. at 386 (¶24). However, the step-great-grandfather proximately caused the estrangement when he told the child he was happy that the child's grandmother had died. *Id*. The Court held that it would be "unjust" for the step-great-grandfather "to take advantage of such fact" and affirmed the chancery court's order to not terminate the child-support obligations. *Id*.

¶40. Here, C.R.H. and Jim are estranged because of C.R.H.'s refusal to see or speak to Jim. However, the estrangement between father and son stems from Jim's abuse and neglect. C.R.H. described an event where Jim forced C.R.H. to hold his arms up against a wall until he was in pain and crying. C.R.H. also witnessed Jim abuse L.S.H. so harshly that L.S.H. showed up to school with marks on his neck. The matter was referred to DHS, which substantiated the child-abuse claims. The boy's stepmother also abused them when they were younger by slapping them or pulling their hair.

¶41. C.R.H.'s trial testimony indicates that a looming factor which put strain on his relationship with his father was Jim's lack of interest in his son and his future. C.R.H. repeatedly stated, "In general he is not very interested in what I do or my future." C.R.H. explained that Jim had only attended two of his band performances. One of those performances was when C.R.H. was in sixth grade—C.R.H. was a senior in high school at the time of the trial. Jim argued that he did not attend C.R.H.'s band performances because

14

he did not know when they were. However, Jim also did not attend a single one of C.R.H.'s football games, which were held at the same place every Friday night.

¶42. "Estrangement is not an excuse for failing to pay child support." *Lowrey v. Lowrey*, 25 So. 3d 274, 294 (¶48) (Miss. 2009). Even though C.R.H. has refused to see or speak to Jim and has expressed an unwillingness to have a relationship with him, the proximate cause of the erosion in the relationship lies with Jim. C.R.H.'s conduct does not rise to the level of "clear and extreme" actions found in *Brown*. Accordingly, we reverse and render the termination of Jim's child-support obligation for C.R.H.

## CONCLUSION

¶43. The bench order was too vague to enforce. Therefore, we reverse and render the chancery court's order of contempt. Because we reverse and render the contempt in relation to the bench order, we must also reverse and remand the contempt in relation to the written order. Further, we reverse and render the termination of Jim's child-support obligation to C.R.H.

¶44. **REVERSED, RENDERED, AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE AND LAWRENCE, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

15