# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00425-SCT

*THOMAS M. DENNIS*

*v.*

*SHELIA F. DENNIS*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/05/2016 |
| TRIAL JUDGE: | HON. KENNETH M. BURNS |
| TRIAL COURT ATTORNEYS: | MARC DARREN AMOS |
| | CARRIE A. JOURDAN |
| | LISA LYNN MEGGS |
| | J. TYSON GRAHAM |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID C. OWEN |
| ATTORNEY FOR APPELLEE: | SHELIA F. DENNIS (PRO SE) |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 08/03/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., KING AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     Thomas Dennis appeals from the judgment of the Chancery Court of Lowndes County, arguing that the chancellor erred by denying a petition to terminate his child-support obligations with respect to his step-great-grandchild, J.R.H.[1] We affirm the decision of the chancellor.

---

[1]To protect the minor child's confidentiality, we refer to the child by the child's initials.

## FACTS AND PROCEDURAL HISTORY

¶2. On March 28, 1994, Thomas Dennis ("Dennis") and Sheila Sims Dennis ("Sims") were married to each other.[2] Prior to her relationship with Dennis, Sims had a daughter named Renee Wright. Renee then had a daughter named Courtney; thus, Courtney is Sims's granddaughter. Courtney married Josh Hartzell, and they are the natural parents of J.R.H. Therefore, Sims is J.R.H.'s great-grandmother and, by extension, Dennis was J.R.H.'s step-great-grandfather. J.R.H. and Dennis are not blood-related in any way.

¶3. In May 2005, the Mississippi Department of Human Services ("DHS") informed Sims that J.R.H.'s natural parents (the Hartzells) had gotten into legal trouble. According to Sims, DHS told her that she could either come get J.R.H. or that DHS would put the child "in the system." So, in October 2005, Dennis, Sims, and the Hartzells filed a Joint Petition for Child Custody in Lowndes County. All parties agreed that it would be in the best interest of J.R.H. to be placed in the custody of and reside with Dennis and Sims. In the petition, the Hartzells each agreed to pay $106 per month to Dennis and Sims for the care, maintenance, and support of J.R.H. The Hartzells also requested visitation rights for alternating weekends, holidays, and summers. On March 13, 2006, the Chancery Court of Lowndes County entered an order granting the parties' requests.

¶4. About six months later, on or around October 10, 2006, Dennis and Sims separated. Two years later, on June 11, 2008, Sims filed for divorce. A judgment granting an irreconcilable-differences divorce was entered one year later on June 23, 2009. Incorporated

_____

[2]The case is styled ***Dennis v. Dennis*** but Sims has gone back to using her maiden name since her divorce from Dennis. Therefore, we refer to Sims by her maiden name.

into the divorce decree was a Child Custody and Support and Property Settlement Agreement ("the Agreement") which gave Sims sole legal custody of J.R.H.  In the Agreement, Dennis agreed to pay $400 per month to Sims for child support, and he was granted visitation rights with J.R.H.[3]  According to Dennis, he exercised his visitation rights with J.R.H. until the child refused to see him anymore.

¶5.    At some point after Dennis's and Sims's divorce, J.R.H. cut off any relationship with Dennis.  According to Sims, Dennis told J.R.H. that he was happy that the child's grandmother (Sims's daughter Renee Wright) had died.  Dennis denies making any such statement.  Regardless of what was said, it is undisputed that J.R.H. currently refuses to see or speak to Dennis.  Sims further stated that she will not make J.R.H. see Dennis and that the "relationship is terminated as long as [J.R.H.] wants it to be that way."

¶6.    On November 20, 2015, Dennis filed an amended petition to consolidate the divorce matter and the child-custody matter and to modify the child-custody and support agreement. In his petition, Dennis argued  that the chancellor should allow him to relinquish his custody of J.R.H. and to terminate any ongoing[4] child-support obligations.  According to the petition, Dennis "wrongfully believed that some sort of legal duty existed pursuant to applicable law for him to pay child support."  Dennis claimed to have "never developed any real

---

[3]The agreement stated that child support was to continue until: (1) the minor child marries; (2) the minor child enlists in any branch of the armed forces; (3) the minor child is no longer attending school on a full-time basis prior to the age of twenty-one years; (4) the minor child reaches the age of twenty-one years; or (5) at any time that a court of competent jurisdiction shall change, alter, modify, or terminate this obligation.

[4]Dennis does not seek a refund or forgiveness for any past-due child-support payments.

parental/familiar relationship with J.R.H." and that J.R.H. had terminated any relationship with him. He also claimed that J.R.H.'s "parents still have parental visitation rights and have the legal obligation to provide child support."

¶7. The chancellor held a hearing and ultimately denied Dennis's requested relief. The chancellor concluded that no material change in circumstances had arisen. The chancellor also rejected Dennis's argument that his child-support obligations should be terminated because of J.R.H.'s refusal to see or speak to him for two years. He reasoned that the child was only twelve years old and therefore "not old enough to appreciate that [the] failure to have a relationship with Mr. Dennis is legally significant." Dennis now appeals, raising nine issues. We restate and combine these issues into three arguments for clarity:

> I. Whether there is a legal basis for child support or, alternatively, whether the collapse of the relationship justifies termination.

> II. Whether the natural parents' ongoing parental obligations establish that Dennis should not be required to pay child support.

> III. Whether Dennis should be permitted voluntarily to terminate his custodial obligations.

## STANDARD OF REVIEW

¶8. Our review of a chancellor's decision is limited. *Dep't of Human Servs., State of Mississippi v. Marshall*, 859 So. 2d 387, 389 (Miss. 2003). "We will not disturb a chancellor's findings unless the court was manifestly wrong, abused its discretion or applied an erroneous legal standard." *Id*. Legal questions receive de novo review. *Sanford v. Sanford*, 124 So. 3d 647, 652-53 (Miss. 2013).

4

¶9.     We first note that Sims, who proceeded *pro se* below, failed to file an appellee's brief with this Court.  Generally, the "[f]ailure of an appellee to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of appealing party, that there was no error." *Sanders v. Chamblee*, 819 So. 2d 1275, 1277 (Miss. 2002) (quoting *Dethlefs v. Beau Maison Dev. Corp.*, 458 So. 2d 714, 717 (Miss. 1984)).  "Where the appellant's brief makes out an apparent case of error . . . , we do not regard it as our obligation to look to the record to find a way to avoid the force of the appellants' argument." *Id*.

¶10.     This Court, however, may choose to review a case on the merits of the record without an appellee's brief when the case "involves an issue affecting the public interest[.]" *Id*. Because this case concerns issues regarding child custody and support modification, as well as who may be held accountable for child-support obligations, we choose to review this case on the merits.  *See Allred v. Allred*, 735 So. 2d 1064, 1067 (Miss. Ct. App. 1999) ("Because, to some extent, this proceeding touches on matters relating to the welfare of minor children, this Court has determined to reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee.").

> **I.       Whether there is a legal basis for child support or, alternatively, whether the collapse of the relationship justifies termination.**

¶11.     Dennis's primary argument is that he has no duty to provide support to J.R.H. because

he is not the child's parent. Citing Mississippi Code Section 93-5-23,[5] he argues that only the natural parents of a child or those standing *in loco parentis* have support obligations.

¶12.    This Court has "defined a person acting *in loco parentis* as one who has assumed the status and obligations of a parent without a formal adoption." ***Logan v. Logan***, 730 So. 2d 1124, 1126 (Miss. 1998). "Any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child is said to stand [*in loco parentis*]." ***Griffith v. Pell***, 881 So. 2d 184, 186 n.1 (quoting ***Logan***, 730 So. 2d at 1126). Here, Dennis argues that he is not *in loco parentis* and that he never sought to supplant J.R.H.'s relationship with the natural parents. To the contrary, he claims that he spent less than a year in the same home with J.R.H. before moving out and separating from Sims and never assumed the role of stepfather. Therefore, he argues that the chancellor erred by not allowing him voluntarily to terminate his obligations because no duty exists for him to pay child support.

¶13.    From the outset, we restate that a third party who takes temporary custody of a child

---

[5]The statute reads, in part,

> When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody and maintenance *of the children of the marriage*, and also touching the maintenance and alimony of the wife or the husband, or any allowance to be made to her or him, and shall, if need be, require bond, sureties or other guarantee for the payment of the sum so allowed. Orders touching on the custody of the children of the marriage shall be made in accordance with the provisions of Section 93-5-24.

Miss. Code Ann. § 93-5-23 (Rev. 2013) (emphasis added).

6

and who does not stand *in loco parentis* has no obligation to support the child once the custody has ended. In **Williams v. Williams**, this Court held that "in the absence of consanguinity, legal adoption, or a knowing and voluntary assumption of the obligation to provide support, the law will not compel one who has stood in the place of a parent to support the child after the relationship has ceased." **Williams v. Williams**, 843 So. 2d 720, 723 (Miss. 2003) (quoting **NPA v. WBA**, 8 Va. App. 246, 251, 380 S.E.2d 178, 181 (1989)). Every day, family members, foster parents, and others take on responsibility to care and provide for children for various reasons, including situations like the case at hand where the natural parents apparently were unable to do so. Holding third parties accountable for child-support obligations after their custody has ended may cause people to be less likely to take custody of a child out of benevolence. Therefore, simply by agreeing to take custody of J.R.H. when DHS called, Dennis did not assume a legal obligation to provide for J.R.H. after his custody ended.

¶14. The analysis, however, does not end here under the facts of this case. Here, Dennis agreed to provide child support for J.R.H. in the Child Custody and Support and Property Settlement Agreement incorporated into his irreconcilable-differences divorce decree. Therefore, the issue is not whether Dennis has a statutory duty to pay child support, but rather whether he has a quasicontractual obligation to do so. "We do not hold that a man who is not a child's biological father can be absolved of his support obligations in all cases. Those who have adopted the child or *voluntarily and knowingly assumed the obligation of support will be required to continue doing so.*" **Id**. at n.1 (citing **NPA**, 380 S.E.2d at 181) (emphasis

7

added).

¶15.     In Mississippi, one of the steps parties must take to obtain an irreconcilable-differences divorce is to enter into a written settlement agreement that provides "for the custody and maintenance of any children of that marriage and for the settlement of any property rights between the parties." Miss. Code Ann. § 93-5-2(2) (Rev. 2013).  The parties may provide the chancellor with such an agreement or, if the parties cannot agree as to certain issues, consent in writing to the divorce and allow the chancellor to decide the contested issues.  *See id*.; *see also* Miss. Code Ann. § 93-5-2(3) (Rev. 2013).  The chancellor then determines whether the terms of the agreement "are adequate and sufficient." *Id*.  In ***West v. West***, this Court emphasized that these

> "[S]ettlement agreements entered into by divorcing spouses and judicially approved under our Irreconcilable Differences Divorce Act become a part of the decree and enforceable as such as though entered by the court following contested proceedings." When the Irreconcilable Differences Divorce Act has been complied with, the custody, support, alimony, and property settlement agreement becomes a part of the final decree for all intents and purposes. If the agreement is sufficient to comply with the statute, that is enough to render it a part of the final decree of divorce as if the decree had been rendered by the chancery court following a contested divorce proceeding.
>
> "[P]roperty settlement agreements are contractual obligations." The provisions of a property settlement agreement executed prior to the dissolution of marriage must be interpreted by courts as any other contract. In ***East v. East***, 493 So. 2d 927, 931–32 (Miss. 1986), we held "[a] true and genuine property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character."

***West v. West***, 891 So. 2d 203, 210 (Miss. 2004) (internal citations omitted).

¶16.     This case is, to an extent, similar to ***Lee v. Lee***, 12 So. 3d 548 (Miss. Ct. App. 2009).

8

In that case, the Lees were married in 1994. *Lee*, 12 So. 3d at 549. During their marriage, the wife gave birth to two children. *Id*. In 2004, the husband "had a home DNA test performed to determine whether he was [the second child's] biological father." *Id*. The test showed a zero percent chance that he had fathered the second child. *Id*. The next year, however, the Lees swore that both children were born to the marriage in their joint bill for divorce and the husband agreed to pay child support for both children in the child-custody and settlement agreement. *Id*. Two years after the divorce was granted, the husband petitioned the chancellor "to reverse the determination that he is [the second child's] biological father and release him of all parental responsibilities, including child support, as to [the second child]." *Id*. The chancellor denied the husband's request. *Id*.

¶17. The Court of Appeals unanimously affirmed the decision of the chancellor. *Id*. at 552. The court reasoned that the husband "knew a year before the judgment of divorce was entered that [the second child] was not his child. Despite this knowledge, he *voluntarily* agreed to support [the second child] and to exercise parental visitation with her." *Id*. at 551 (emphasis added). The Court of Appeals distinguished *Lee* from *Williams*, where this Court allowed a man to discontinue his child-support payments when he determined, *after* his divorce, that he was paying support for someone who was not his child. *Williams*, So. 2d at 721, 723.

¶18. As in *Lee*, the evidence shows that Dennis knowingly and voluntarily agreed to pay child support for J.R.H. even though he knew he was not the child's father.[6] Though Dennis

---

[6]We note that no portion of Dennis's brief addresses whether he voluntarily assumed a quasicontractual duty to pay child support or whether he had contractual defense to the

claims he wrongfully believed he had a duty to support J.R.H., the Agreement states that "Husband and Wife each fully understand the terms and conditions of this Agreement and believe it to be just, fair, adequate, and reasonable . . . ." Under the section titled "VOLUNTARY EXECUTION," the Agreement states that "[e]ach party acknowledges that he or she has read this Agreement in its entirety, understands its terms, consents to its terms, and enters into this Agreement voluntarily of the uses and purposes therein stated."

¶19. As mentioned above, these child-custody and property-settlement agreements are quasicontracts in which both spouses consent to certain terms in order to obtain an irreconcilable-differences divorce. Thus, we find that a bargained-for exchange occurred whereby Dennis got something in return for paying child support: a divorce. Even more, this Court has stated:

> In property and financial matters between the divorcing spouses themselves, *there is no question that, absent fraud or overreaching, the parties should be allowed broad latitude*. When the parties have reached agreement and the chancery court has approved it, we ought enforce it and take as dim a view of efforts to modify it, as we ordinarily do when persons seek relief from their improvident contracts..

**Bell v. Bell**, 572 So. 2d 841, 844 (Miss. 1990) (emphasis added) (citations ommitted).

¶20. Under the facts of this case, we find that Dennis voluntarily agreed to pay child support for J.R.H. We disagree with the dissent that a chancellor does not have the authority to accept a settlement agreement that governs child-support payments for a child not of the marriage. A chancellor's power to accept such an agreement is granted by Section 159 of

---

Agreement. Dennis never claimed to the chancellor, nor to this Court, that the Agreement was signed under duress, obtained by fraud, based on a unilateral or mutual mistake, or substantively unconscionable.

10

the Constitution. Miss. Const. art. 6, § 159. While a chancellor's power is codified by statute, we consistently have held that a chancellor has broad discretion over child-support agreements. *Short v. Short*, 131 So. 3d 1149, 1151 (Miss. 2014). Further, a chancellor's discretion extends to matters that are not codified. *See Logan v. Logan*, 730 So. 2d 1124, 1126 (Miss. 1998) (recognizing the doctrine of *in loco parentis* within the child-custody context).

¶21. Notwithstanding their contractual nature, child-support and property-settlement agreements may be modified when there is an after-arising material or substantial change in the circumstances among the parties. *See Shipley v. Ferguson*, 638 So. 2d 1295, 1298 (Miss. 1994). Dennis next argues that J.R.H.'s refusal to see or speak to him constitutes clear and extreme conduct that entitles him to terminate his support obligations. We disagree.

¶22. In *Caldwell v. Caldwell*, 579 So. 2d 543, 548 (Miss. 1991), this Court stated that "[t]he amount of money that the noncustodial parent is required to pay for the support of his minor children should not be determined by the amount of love the children show toward that parent." Later in that opinion, however, this Court recognized that a material change in circumstances could arise from a minor child's actions toward a noncustodial parent which would allow the parent to terminate his or her support obligations. *Id*. "[A] minor child as young as fifteen years old could forfeit his support from the noncustodial parent through his actions toward that parent, *but those actions must be clear and extreme*." *Marshall*, 859 So. 2d at 389-90 (citing *Caldwell*, 579 So. 2d at 548) (emphasis added).

¶23. In *Roberts v. Brown*, an eighteen-year-old daughter testified "that she did not love

11

[her father], that she did not want to visit or communicate with him, that she had had time to visit him but chose not to, and that if the court ordered her to visit her father, she would not do so." *Roberts v. Brown*, 805 So. 2d 649, 650 (Miss. Ct. App. 2002). Even more, the daughter previously had accused her father of rape, a charge of which the father was later acquitted. *Id*. at 650-51. The Court of Appeals found that the conduct of the daughter was clear and extreme conduct that justified the termination of the father's support obligations. *Id*. at 653-54.

¶24. We hold that J.R.H.'s current refusal to see or speak to Dennis is not the type of clear and extreme conduct envisioned in *Caldwell* or shown in *Roberts*, especially in light of the child's age and Dennis's alleged statement. Though it is undisputed that J.R.H. currently is unwilling to have a relationship with Dennis, Sims testified that Dennis told J.R.H. that he was happy that the child's grandmother had died. The chancellor also noted that J.R.H. was only twelve years old when this case was in the chancery court; therefore, J.R.H. would have been even younger when this alleged statement was made. If Dennis indeed made these statements, it would be unjust for him now to take advantage of such fact. At this time, the record does not indicate that the chancellor manifestly erred in his *Caldwell* analysis.[7]

**II. Whether the natural parents' ongoing parental obligations establish that Dennis should not be required to pay child support.**

¶25. Dennis's next series of arguments concern the ongoing obligations of J.R.H.'s natural parents, the Hartzells. Dennis argues that, because the Hartzells have current and ongoing

---

[7]Dennis also summarily asks this Court to depart from the *Caldwell* rule based on the unique facts of this case. We choose not to create an exception to *Caldwell* solely based on these facts.

support obligations, requiring him to pay child support amounts to a windfall or double-dipping with respect to J.R.H.'s child support. He also argues that Sims essentially is authorized to enforce selectively whichever child-support obligation she chooses to enforce. He further claims, apparently for the first time, that, at a minimum, he "should have been granted a reduction in the amount of monthly child support due in the same amount as the amount of child support due from [J.R.H.'s] parents ($212 per month)."

¶26. These arguments highlight the unique nature of Dennis's predicament, especially in light of the Hartzells' ongoing obligations. We find, however, that these arguments simply do not address the main issue: whether Dennis voluntarily assumed the personal obligation to pay child support for J.R.H. We find that the ongoing obligations of the Hartzells do not alter his personal duty to pay Sims pursuant to the Agreement. These arguments are without merit.

### III. Whether Dennis should be permitted voluntarily to terminate his custodial obligations.

¶27. Lastly, Dennis claims that he is only a temporary guardian and thereby is authorized voluntarily to terminate his custodial obligations. He points out that the Hartzells' parental rights were never terminated; thus, they could reassert their parental rights at any time. He also claims it would be against public policy not to allow him to terminate his custodial obligations.

¶28. Again, we find that these arguments do not address the main issue at hand. If the Hartzells reasserted their parental rights, then Dennis potentially could show that there has been an after-arising change in circumstances. Until then, however, we find no merit to these

arguments.

## CONCLUSION

¶29.   For the foregoing reasons, we affirm the decision of the chancellor.

¶30.   **AFFIRMED.**

**WALLER, C.J., DICKINSON, P.J.,  KITCHENS, KING AND BEAM, JJ., CONCUR.  COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, P.J.;  MAXWELL, J., JOINS IN PART.**

**COLEMAN, JUSTICE, DISSENTING:**

¶31.   The quasi-contractual nature of property-settlement agreements notwithstanding, child support awards are legally enforceable not because the parties might agree to them but because the court orders them.  To the extent that the majority holds that the controlling principles of law empower an award of child support to a child not of the marriage because the parties agree to such child support in the property-settlement agreement, I cannot join it.

¶32.   Property-settlement agreements may well be, as the majority writes, quasi-contractual in nature, but the authority of a chancery court to award child support does not arise from or depend upon the bargaining of the parties.  "[W]hile it is true that property-settlement agreements are, in many respects, enforceable contracts, they do not trump a chancellor's obligation to decide alimony, property-division, and child-support issues *based on established legal principles*."  ***West v. West***, 88 So. 3d 735, 741 (¶ 20) (Miss. 2012) (emphasis added).  When property-settlement agreements concerning alimony and child-support are enforceable at law, it is not because the parties agreed to them but because the chancery court confirms and approves them.  ***Id.***

14

¶33. Mississippi Code Section 93-5-23 provides, in pertinent part, as follows:

> When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody and maintenance of the children of the marriage. . . .

The above-quoted section delineates what a chancellor, in an exercise of discretion, may do. It empowers the chancery court to make orders touching the "maintenance of children of the marriage," but it offers no power to the chancery court to use the court's authority to make provisions for children not of the marriage. Put differently, the "established legal principles" discussed by the *West* Court, upon which child support awards must be based, do not authorize a child support award to a step-great-grandchild.

¶34. Because it is ultimately the power of a court decree that establishes binding child support obligations, and not the agreement of the parties, I would hold that the chancery court in the case *sub judice* erred by requiring Thomas to continue making the four-hundred-dollar monthly payments pursuant to its authority to award child support. The quotation of a footnote from ***Williams v. Williams***, 843 So. 2d 720, 723 (¶ 17) n.1 (Miss. 2003), by the majority does not persuade me otherwise. In the footnote, which is *dicta*, the ***Williams*** Court clarified its holding by writing, "Those who have adopted the child or voluntarily and knowingly assumed the obligation of support will be required to continue doing so." ***Id.*** The quoted language is clearly *dicta*, as it is not necessary to the ***Williams*** Court's holding. Moreover, the footnoted language was inserted with no further analysis of the chancery court's power to order child support payments in favor of a child not of the marriage.

¶35. To a significant extent, the majority's citation of Section 159 of the Mississippi

Constitution and *Short v. Short*, 131 So. 3d 1149 (Miss. 2014), supports my position, set forth above, that it is the power of the court – as opposed to an agreement between the parties – that obligates the noncustodial parent to pay child support. Section 159 is jurisdictional, and without doubt it grants chancery courts jurisdiction in "matters and cases" concerning divorce, alimony, and minors' business. I do not suggest otherwise, nor do I suggest that a chancellor may not accept a settlement agreement that governs child-support payments under the right conditions. What I do maintain is that, after the question of subject-matter jurisdiction is settled, there remains the question of what, under our substantive law elsewhere announced, *i.e.*, statutes, child support is. In Section 93-5-23, the Legislature has announced that it is something awarded for "the care, custody and maintenance of the *children of the marriage. . . .*" Miss. Code Ann. § 93-5-23 (Rev. 2013) (emphasis added).

¶36.   In responding to my dissent, the majority takes the position that the Section 159 grant of jurisdiction also grants substantive power to chancellors to grant child support to children not of the marriage even though the Legislature has defined child support awards as awards made for the children of the marriage. In doing so, the majority at least suggests that the Section 93-5-23 demarcation is unconstitutional. However, the majority cites no other authority to suggest that the Legislature does not have the power to define child support. The Legislature is the policy-making body, *Little v. Mississippi Department of Transportation*, 129 So. 3d 132, 138 (¶ 12) (Miss. 2013), and has determined that child support may be awarded by chancery courts to children of a marriage. Without holding beyond a reasonable doubt that the statutory law is unconstitutional, we should follow it and not seek to change

16

it. ***Stockstill v. State***, 854 So. 2d 1017, 1022–23 (¶ 13) (Miss. 2003) (quoting ***Anderson v. Lambert***, 494 So. 2d 370, 372 (Miss. 1986)).  Because it is, indeed, the constitutionally granted power of the chancery court to award child support and enforce the award that gives such an award force, and the statutes define child support in a way that does not include the step-great-grandchild, the chancery court did not have the authority to enforce the four-hundred-dollar monthly payment obligation as child support.

¶37.    Accordingly, I respectfully dissent and would reverse the chancellor's judgment and remand for further proceedings.

**RANDOLPH, P.J., JOINS THIS OPINION.  MAXWELL, J., JOINS THIS OPINION IN PART.**