# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CT-01184-SCT

*STACEY DAVIS*

*v.*

*JAMES LESLIE HENDERSON*

### ON MOTION FOR REHEARING
### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 06/04/2019 |
| TRIAL JUDGE: | HON. ROBERT GEORGE CLARK, III |
| TRIAL COURT ATTORNEYS: | PAUL E. ROGERS |
| | CLAYTON HAROL GESTES |
| | JEFFREY GRAY BAKER HOUSTON |
| | DAVID RANDALL WADE |
| | MEDA BYRD LINDLEY |
| | MATTHEW CHARLES RAPHAEL, JR. |
| | TRACY A. BOWEN |
| | BRIDGET RENEA TODD |
| | DAVID BRIDGES |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | PAUL E. ROGERS |
| | MARY CATHERINE WILLIAMS |
| ATTORNEY FOR APPELLEE: | DAVID RANDALL WADE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED, AND THE CASE IS REMANDED - 01/27/2022 |
| MOTION FOR REHEARING FILED: | 10/01/2021 |
| MANDATE ISSUED: | |

      **EN BANC.**

      **BEAM, JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is granted.  The previous opinions are withdrawn, and the following opinions are substituted.

¶2.     This certiorari case considers the temporary termination of a father's child-support obligation.  Because we find that the Court of Appeals did not apply the abuse-of-discretion standard of review applicable to the chancery court's decision regarding the child-support termination, we reverse the decision of the Court of Appeals.  We reinstate and affirm the judgment of the chancery court terminating the father's child-support obligation to one child.  However, because the chancellor did not make a new finding on the amount of child support applicable to one child, we remand the case to the chancery court.

**FACTS**

¶3.     James "Jim" Henderson and Stacey Davis were divorced in April 2004.  In May 2005, Stacey received sole legal and physical custody of the parties' two minor sons subject to Jim's visitation rights.[1]  Since then, the parties have been in numerous proceedings involving custody, visitation, and contempt.  In 2018, Jim filed his sixth petition for citation of contempt against Stacey and a petition to terminate his financial obligations for one of the minor sons, C.R.H.

¶4.     After the hearing,

> The chancery court found that "the failure for visitation between the minors and Jim primarily lies with the minors' desire not to see their father." The chancery court ruled "that the actions of the minors are clear and extreme enough to warrant a temporary suspension of child support until such time as all parents and all children participate in co-parenting and reunification

---

[1] While the sons were nearing college age at the time of the hearing in 2019, both are are at least age twenty-one now.

2

counseling." It further ruled that "Jim's obligation to pay child support . . . [was] temporarily suspended until such time as Jim, Stacey, L.S.H., and C.R.H . . . . participated in co-parenting and parental reunification counseling[.]"

A year later, the chancery court issued its final judgment and granted Jim's request to terminate his financial obligation to C.R.H. The court held that "C.R.H.'s hostility towards his father and his abandonment of the father-son relationship constitute[d] clear and extreme conduct, and warrant[ed] the termination of Jim's obligation to pay child support for C.R.H." It further held that "Jim's child support obligation for C.R.H. [was] terminated, until such time as C.R.H. [ ] resumed his regular visitation with [Jim] on a consistent basis and a viable father-son relationship exists between C.R.H. and Jim." The court found that L.S.H. had some relationship with his father and reinstated Jim's child-support obligation to him. Jim's child-support obligation for the children was reduced by half, to $1,000 per month.

*Davis v. Henderson*, No. 2018-CA-001184-COA, 2020 WL 5793021, at *3 (Miss. Ct. App. Sept. 29, 2020) (alterations in original).

¶5.     The chancellor determined that the lack of visitation between C.R.H. and Jim has been an ongoing, long-term occurrence because of C.R.H.'s desire not to see his father. While the paramount reason for failure of visitation was the minors, Stacey's contempt also prevented this from taking place.

¶6.     The Court of Appeals reversed the chancellor's decision, disagreeing with the chancellor that C.R.H. and Stacey were responsible for the strained relationship. *Id.* at *7. The Court of Appeals found that Jim's conduct caused the lack of visitation. *Id.* at *6.

¶7.     Jim filed a petition for writ of certiorari and argued that the decision of the Court of Appeals is in conflict with well-established law, which articulates the applicable standard of appellate review. We granted the petition.

**STANDARD OF REVIEW**

3

¶8. "The standard of review in child custody cases is quite limited. A chancellor must be manifestly wrong, clearly erroneous, or apply an erroneous legal standard in order for this Court to reverse." *Johnson v. Gray*, 859 So. 2d 1006, 1012 (Miss. 2003) (citing *Mabus v. Mabus*, 847 So. 2d 815, 818 (Miss. 2003)). "[F]indings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial, credible evidence." *Marascalco v. Marascalco*, 445 So. 2d 1380, 1382 (Miss. 1984).

## DISCUSSION

¶9. This Court in *Caldwell v. Caldwell* recognized that there might be instances when a child's actions could cause a forfeiture of child support. *Caldwell v. Caldwell*, 579 So. 2d 543, 548 (Miss. 1991). "Those actions would have to be clear and extreme[.]" *Id.*

¶10. Here, the chancellor found that C.R.H.'s hostility and abandonment of the father-son relationship were clear and extreme, warranting termination of Jim's child-support obligations.

¶11. C.R.H. testified that he has not seen his father since January 2015 and that he has no interest in having a relationship with his father. He testified that he does not respond to text messages or phone calls from his father and, in fact, he would rather go to jail than to visit his father. C.R.H. told the guardian ad litem he hated his father and did not need his father in his life.

¶12. Therefore, the chancellor determined that Jim's obligation was terminated "until such time as C.R.H. has resumed his regular visitation with his father on a consistent basis and a viable father-son relationship exists."

4

¶13. In *Copeland v. Copeland*, the chancellor terminated a father's child-support obligations when the children sent hateful emails and texts stating they wished he were dead. *Copeland v. Copeland*, 235 So. 3d 91, 96 (Miss. 2017). The chancellor found that the children's conduct amounted to the extreme conduct permitting a termination of a father's child-support obligation but "left the door open for reconciliation and expressed his willingness to reconsider the resumption of child support." *Id.* at 94 (citing *Caldwell*, 579 So. 2d at 548). This Court affirmed the ruling of the chancellor. *Id.*

> When reviewing a chancellor's decision to terminate a parent's financial obligations to his or her child, we do not ask if the decision is the same one we *would* have made. Rather, we are instructed to give the chancellor deference and ask whether the decision is one the chancellor *could* have made.

*Id.* at 97 (quoting *Stasny v. Wages*, 116 So. 3d 195, 196 (Miss. Ct. App. 2013)).

¶14. We find that the Court of Appeals did not adhere to this standard of review. In stark contrast to the chancellor's findings, the Court of Appeals found that "the proximate cause of the erosion of the relationship lies with Jim[,]" *Davis*, 2020 WL 5793021, at *7, and while "C.R.H. and Jim are estranged because of C.R.H.'s refusal to see or speak to Jim[,] . . . [t]he estrangement between father and son stems from Jim's abuse and neglect." *Id.* at *6. Therefore, the Court of Appeals concluded that "C.R.H.'s conduct does not rise to the level of 'clear and extreme' actions." *Id.* at *7.

¶15. Similarly, Presiding Justice Kitchens's dissent concludes, after a lengthy recitation of the facts, that C.R.H.'s actions do not rise to the elevated standard in *Caldwell*.

¶16. But, without finding "the chancellor abused [his] discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied[,]" we must "affirm findings

5

of fact by chancellors[.]" ***Borden v. Borden***, 167 So. 3d 238, 241 (Miss. 2014) (internal quotation marks omitted) (quoting ***Robison v. Lanford***, 841 So. 2d 1119, 1122 (Miss. 2003)). As long as substantial evidence supports the chancellor's findings, an appellate court is without authority to disturb them, even if it would have found otherwise as an original matter. ***Joel v. Joel***, 43 So. 3d 424, 429 (Miss. 2010) (citing ***Ferrara v. Walters***, 919 So. 2d 876, 880-81 (Miss. 2005)).

¶17.    The dissent highlights cases in which termination of child-support obligations were not warranted under the ***Caldwell*** standard, but these cases are factually different. In ***Department of Human Services v. Marshall***, "this Court reversed the chancellor's findings that '[o]ne bad visit. . . does not rise to the level . . . envisioned by ***Caldwell***.'" ***Dep't of Hum. Servs. v. Marshall***, 859 So. 2d 387, 390 (Miss. 2003). Here, the chancellor did not find a mere one bad visit. The chancellor found that the lack of visitation was an ongoing, long-term occurrence. In ***Dennis v. Dennis***, this Court affirmed the chancellor who found that a twelve-year-old was "not old enough to appreciate that [the] failure to have a relationship . . . is legally significant." ***Dennis v. Dennis***, 234 So. 3d 371, 374 (Miss. 2017). Here, C.R.H. was nearing college age at the time of the hearing in 2019, and C.R.H. testified that he had not seen his father since 2015 and had no interest in having a relationship with him.

¶18.    The dissent finds that we are reversing for the lack of evidence of abuse and neglect. While we do find that the Court of Appeals went beyond the chancellor's findings and found

6

abuse and neglect, which are not supported by the record, the major flaw is the Court of Appeals' failing to the defer to the chancellor's findings.

¶19. The only allegation of abuse was an incident that happened in 2014. Jim made C.R.H. hold his hands against the wall for a period of time until he cried. L.S.H. testified that Jim slapped him on his neck. School workers noticed the marks and called the Mississippi Department of Human Services.

¶20. Stacey claims that DHS investigated and substantiated the charge, which the Court of Appeals accepted without any other evidence. Jim testified that Judge Goree reviewed these charges in prior proceedings and found nothing. The guardian ad litem concluded at the time that it was an isolated incident and that it did not warrant any change in the then-existing visitation schedule.

¶21. The Court of Appeals also found that Jim's conduct constituted neglect. C.R.H. testified that Jim had only attended two of his band performances. Jim testified that he had a hard time finding out the schedule because Stacey and C.R.H. would not tell him and because Stacey had placed him on the "no contact" list at school. Stacey testified that she has legal custody of the minors; therefore, it was totally acceptable to have Jim, the father, on the no-contact list at school. We find that neither abuse nor neglect is supported by the record.

¶22. What is supported by the record is that the chancellor heard the testimony of C.R.H., the chancellor determined the lack of visitation between C.R.H. and Jim has been an

7

ongoing, long-term occurrence, and the chancellor has been the one hearing the numerous issues brought before the court since the divorce in 2005.

¶23.    We are reminded that "[o]ur review. . . . is significantly constrained." *Cupit v. Cupit*, 559 So. 2d 1035, 1037 (Miss. 1990). In determinations of child support or modifications of support, we recognize that "the chancellor is accorded substantial discretion . . . ." *Tedford v. Dempsey*, 437 So. 2d 410, 417 (Miss. 1983). We recognize that the chancellor "hears all the facts, views the witnesses, and is informed at trial of the circumstances of the parties and particularly the circumstances of the children." *Thurman v. Thurman*, 559 So. 2d 1014, 1017 (Miss. 1990). Likewise, in cases of termination of child support, we are not inclined to stray from the chancellor's decision absent an abuse of discretion. *Copeland*, 235 So. 3d at 98.

¶24.    We stand by this Court's holding in *Copeland* "that the chancellor, being the only one to view the witnesses and observe their demeanor, is in the best position to determine if the actions and conduct of the minor child[] were convincingly clear and extreme, warranting a termination of child support." *Id.* at 96.

¶25.    We defer to the chancellor who has supported his findings with substantial evidence. As such, we find that the Court of Appeals substituted its own findings in place of those of the chancellor; however, we remand the case to the chancery court to make a proper determination of the amount of child support suitable for one child.

¶26.    In terminating child support, the chancellor failed to make a new finding of the appropriate amount of child support remaining for one child. *See* Miss. Code Ann. § 43-19-

8

10 (Rev. 2021). According to Stacey, the chancellor split the former $2000 of child support for two children to $1000 for one child. She raised this issue before the Court of Appeals, but because the Court of Appeals reversed the chancellor's termination of child support, the Court of Appeals did not address the issue of the amount of child support. We find the split was arbitrary, and the chancellor is required to make findings of a new amount sufficient for one child.

## CONCLUSION

¶27. Because the Court of Appeals disturbed the chancellor's findings of fact in regard to the child support termination, we reverse the decision of the Court of Appeals. In reinstating the chancellor's termination of child support, however, we remand the case to the chancery court to make a proper finding of the amount of child support for one child.

¶28. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED, AND THE CASE IS REMANDED.**

**RANDOLPH, C.J., MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶29. I would affirm the decision of the Court of Appeals that reversed the Madison County Chancery Court's termination of a father's child support obligation based on the hostility expressed toward him by his seventeen-year-old son, C.R.H. The Court of Appeals reversed, finding that the deterioration of the father-son relationship had been caused by the father's abuse and neglect. The majority finds that the evidence of abuse and neglect was an

9

insufficient basis for reversal, reinstates the chancellor's decision to terminate support, and remands for a determination of the proper amount of support for the other child. I would affirm the decision of the Court of Appeals. This Court has held that termination of child support is reserved for cases of clear and extreme actions by a child disavowing the parent-child relationship. *Caldwell v. Caldwell*, 579 So. 2d 543, 548 (Miss. 1991). Child support stems from a parent's fundamental obligation to support his or her child. It is not something a child must earn though expressions of love and affection for the parent, nor is it a *quid pro quo* for visitation. Therefore, termination of child support should be reserved for those rare cases that demonstrate a rejection of the parent-child relationship that is clear and extreme. I would hold that the actions of C.R.H., who was participating in parental reunification counseling and said that he loved his father, did not rise to the level of clear and extreme conduct sufficient to forfeit his right to child support.

### A.     Facts

¶30.    James Henderson and Stacey Davis were divorced in 2005. Two children were born of the marriage, L.S.H. and C.R.H. The children were in high school and aged eighteen and seventeen, respectively, during the trial in March 2019. At the time of the divorce, Davis was awarded sole custody, and Henderson was awarded visitation. The chancery court temporarily switched sole custody of L.S.H. to Henderson for the purpose of admitting L.S.H. into an in-patient treatment facility. After L.S.H. left the facility and returned to his mother's custody, the chancellor ordered Davis and Henderson to participate in counseling to develop coparenting and communication skills. The counselor recommended that the

10

children begin parental reunification counseling with their father. But Davis refused to bring the children to the counselor's office, prompting Henderson's filing of a motion for contempt, arguing that Davis was not participating in the court-ordered counseling and was interfering with his visitation rights. He claimed that Davis had kept the children from going to visitation for three years and that she had failed to remove his no-contact status at the children's school, which prevented him from contacting his children at school or obtaining any information about them from the school. He averred also that Davis had failed to bring the children to the court-ordered counseling sessions.

¶31. At a hearing on the contempt motion, licensed professional counselor Steven Stafford testified that Davis had not complied with the recommendation for the boys to undergo parental reunification counseling with their father. He testified that C.R.H. had not met with his father in three years. Henderson testified that Davis had blocked his phone number on the boys' cell phones, cutting off his ability to communicate with them. Davis admitted having taken that step. She testified about the boys' estrangement from their father, citing an incident that had occurred years before when Henderson had strangled L.S.H., leaving visible marks that had prompted the school to contact the Mississippi Department of Human Services (DHS). She testified that C.R.H. had witnessed that incident. L.S.H. testified that he did not want to exercise visitation, and C.R.H. did not testify. After the hearing, the chancellor found Davis in contempt for not participating in counseling and not bringing the boys to counseling. The chancellor further found that the children's clear and extreme actions warranted a temporary suspension of child support pending successful parental reunification

11

counseling. Subsequently, both children began attending parental reunification counseling with their father. A trial occurred on Henderson's motion for sole legal custody and termination of child support for both boys on March 4 and 5, 2019.

¶32. The Court of Appeals aptly summarized the evidence pertaining to C.R.H.'s relationship with his father:

> C.R.H. testified his father "has done things that make me not want to see him." He described Jim as abusive and recounted an incident when Jim forced the thirteen-year-old boy to hold up his hands against the wall "for a very long extended period of time" until he was in pain and crying. C.R.H. testified that on that same night, his father pinned his twelve-year-old brother against the wall by his neck, leaving hand marks.

> When L.S.H. returned to school after his visitation with Jim, the school counselor questioned him about the marks on his neck. The counselor then filed a report with the Mississippi Department of Human Services (DHS), which initiated an investigation. The DHS investigation substantiated the allegations of child abuse. The matter was then referred to the youth court. However, the youth court declined to hear the case because there was a pending action in the chancery court. C.R.H. also stated that his stepmother was abusive as well. He testified that "when we were younger, if we did anything that she saw as unfit, she would either slap us or pull our hair."

> C.R.H. testified that Jim's controlling behavior was one of the reasons he no longer wanted to have visitation with his father. When visiting Jim, C.R.H. was not allowed to close his bedroom door or go outside and play in the yard. Instead, C.R.H. said he was "required to always stay in the front foyer of the house where [he could] be easily observed." Jim would normally take C.R.H.'s phone away from him to restrict the boy's communication with his mother. He also would not give him the password to access the internet. Also, even though C.R.H. loved to cook, he was not allowed to do so at Jim's house. Because Jim and his wife only cooked "occasionally," the family primarily ate "[e]ither fast food or some easy homemade meal."

> C.R.H. is fearful of his father. He stated at trial, "I am afraid that if I try to have any sort of normal relationship with me [sic], I might end up in a very scary situation that I might not be able to get out of." When asked for an example of what he was referring to, C.R.H. responded, "How my brother was

held . . . at my dad's house for two to three months and was forcefully [taken] out of school and only fed fast food and gained weight and was restricted from seeing his friends or anything of that sort."

C.R.H. testified that he does love his father on "some level" but is not interested in having an ongoing relationship with him. C.R.H's largest and most frequently repeated complaint about Jim is that "[i]n general he is not very interested in what I do or my future." He explained, "Going to college and getting a job and going to graduate school after college are a big thing that my father seems very neglectful in, participating in, or helping or assisting in." Jim did not go to any of C.R.H's football games and only attended two of his band performances, one being several years prior when he was in sixth grade.

C.R.H. said that he could not think of anything that he could do with his dad to improve their relationship, but he also expressed a desire for his father to "[s]how some regard for [C.R.H.'s] future and [can] show active interest in what [C.R.H. is] participating in." He also said he would be more inclined to respond to Jim's text messages if he were to "strike a meaningful conversation" rather than "[j]ust, 'Hello . . . and [sending] random pictures."

*Davis v. Henderson*, No. 2018-CA-00184-COA, 2020 WL 5793021, at *2-3 (Miss. Ct. App. Sept. 29, 2020) (footnote omitted). As the majority observes, C.R.H. testified that he would rather go to jail than spend time with his father. But C.R.H. did testify also that he might be able to improve things by starting a conversation with his father instead of waiting for his father to start one. He indicated that he might be willing to try that in the future but that he had not done so yet. He testified that it would help his feelings toward his father if his father attended all his band performances. C.R.H. was aware that his father was not paying child support for him.

¶33.   Henderson testified that C.R.H. had not had overnight visitation since January or February 2015. He said he had attended six parental reunification counseling sessions with the boys. Henderson testified that, during these sessions, C.R.H. is not hostile but ignores

13

him and responds to the counselor. He said that C.R.H. has never cursed him or made vicious statements to him. But Henderson said his relationship with C.R.H. is "nonexistent" and that in the past he had been stymied in his attempts at communication by Davis's blocking of his number on C.R.H.'s phone. Henderson said that he now calls C.R.H. three times a week and C.R.H. hangs up on him. Henderson testified that he sends C.R.H. birthday and Christmas presents and keeps up with his schedule of activities via the school's website. He further testified that Davis is part of the reason that his relationship with C.R.H. has deteriorated, citing the fact that, before the boys learned to drive, she stopped bringing them to visitation. Henderson opined that "the constant berating from his mother Stacey has caused [C.R.H.] to have a total hatred toward me." Henderson was aware that Davis had told the boys he was a sociopath, a fact which she admitted in her testimony. Moreover, Henderson mentioned Davis's withholding of the boys from parental reunification counseling, conduct for which she was held in contempt. Henderson testified that Davis had had him arrested on several occasions. While placing primary blame on the boys and their mother, Henderson testified that he himself bore some responsibility for his sons' estrangement from him.

¶34.    L.S.H. testified that one cause of the animosity was the continuous custody litigation between his parents. He testified that, for years, his life had revolved around court proceedings, for which he blamed his father's attempts to modify custody. L.S.H. testified that he had noticed C.R.H. "open up a bit" in counseling but that he feared the latest custody proceedings would "put them at ground zero again." L.S.H. testified that his mother had told him and his brother that their father was a sociopath, had Satan in his heart, had mental

14

illness, and was a hoarder. According to L.S.H., both parents "bash on each other constantly." L.S.H. testified about his own feelings toward his father. He said that he attends parental reunification counseling and has dinner with his father occasionally but that he is not yet ready for overnight visitation.

¶35.   Davis testified that she never had stopped the boys from visiting their father. She said that, when C.R.H. was younger, he would lock himself in his bedroom and refuse to go. The record establishes that this began when C.R.H. was about ten years old and Henderson called the police in an attempt to enforce visitation. Davis had never heard the boys wish their father ill will or curse him. She accepted some responsibility for their attitudes. Davis said that, since the divorce, she had not kept Henderson apprised of the boys' health, education, and welfare; however, Henderson never complained about the lack of information. She testified that the boys drive themselves to parental reunification counseling.

¶36.   Toby Riley was a licensed professional counselor who took over the role of parental reunification counselor.  He testified that C.R.H. never said that he hates his father and that the boys seem to believe that their father abused or neglected them, perhaps as a consequence of what their mother has allowed them to think. Riley said that C.R.H. was under the impression that Henderson had held L.S.H. captive when his father had custody of L.S.H. after his inpatient treatment. Riley opined that ongoing court proceedings are one reason that children can view a parent negatively. However, in his opinion, he had heard nothing from either boy to justify their abandonment of the parent-child relationship.

¶37.   Riley testified that C.R.H. comes to counseling sessions and that he participates. He

15

testified that C.R.H. seems withdrawn during the sessions, but that he does respond to his father sometimes. He testified that, during sessions, they brainstorm about ideas for spending time together and that C.R.H. was open to working out with his father. Riley testified that, although when compared to average family relationships C.R.H.'s behavior toward his father is extreme, it is not extreme compared to similar cases of familial estrangement that he has seen. Riley opined that neither boy's relationship with Henderson was a lost cause.

¶38. A guardian *ad litem* report filed in earlier custody modification proceedings on May 21, 2014, was admitted into evidence. Based on an investigation at that time, the guardian *ad litem* concluded the following:

> [T]his is not your typical situation. These parties have been in litigation continuously for years. The previous GAL noted that the mother could do nothing with the boys for fear of it being litigated. It seems the same is true for both parents. Any discipline given by either parent is scrutinized by the other and very often becomes an issue between the parents. In the midst of this I believe the boys have gone without the guidance both parents wish to implement. Albeit I can't imagine two parents having any more diverse ideas about raising children than these two, I still think both Stacey and Jim want what's best for their boys. My worry is that the feud between Stacey and Jim has empowered the boys to a point the parents may be on the verge of losing control. No one wants to see that happen.

¶39. The chancellor denied Henderson's request for legal custody. Finding that "C.R.H.'s hostility towards his father and his abandonment of the father-son relationship constitutes clear and extreme conduct," the chancellor terminated child support for C.R.H. The chancellor placed some of the blame for the estrangement on Davis. The chancellor found that, because L.S.H. had "some relationship" with his father and had attended parental reunification counseling sessions, Henderson was responsible for paying child support for

16

L.S.H. The Court of Appeals reversed the termination of C.R.H.'s child support.

### B. Applicable Law

¶40. Both parents have a continuing legal and moral duty to support their children, and the right to child support belongs to the child. *Alexander v. Alexander*, 494 So. 2d 365, 368 (Miss. 1986). "Child support is awarded to the custodial parent for the benefit and protection of the child, the underlying principle being the legal duty owed to the child for the child's maintenance and best interest." *Id.* "Child support benefits belong to the child, and not the parent who, having custody, receives such benefits under a fiduciary duty to hold and use them for the benefit of the child." *Cumberland v. Cumberland*, 564 So. 2d 839, 847 (Miss. 1990).

¶41. A child support award may be altered upon a material change in circumstances arising after entry of the decree that established support. *Id.* (quoting *Tedford v. Dempsey*, 437 So. 2d 410, 417 (Miss. 1983)). This Court has carved out the narrow exception to the child support obligation at issue in this case. We have held that child support can be terminated when a child, through clear and extreme actions, totally abandons the parent-child relationship. *Caldwell*, 579 So. 2d at 548. *Caldwell*'s language indicated that child support is not dependent on the quality of the parent-child relationship and can be terminated only in extreme situations. The rule is that

> [t]he amount of money that the noncustodial parent is required to pay for the support of his minor children should not be determined by the amount of love the children show toward that parent. The proper inquiry, as we have often stated, is what is in the best interest of the child. In reaching that conclusion, the chancellor must balance the needs of the child against the parent's financial ability to meet those needs.

17

*Id.* (quoting *Holston v. Holston*, 473 A. 2d 459, 463 (Md. 1984), *superseded by statute as stated in Quinn v. Quinn*, 575 A. 2d 764, 766 n.4 (Md. Ct. Spec. App. 1990)). Caldwell said that, while it was conceivable that "a minor child as young as fifteen might by his actions forfeit his support from a noncustodial parent[, t]hose actions would have to be clear and extreme . . . ." *Id.* The Court found that, because the child wanted to improve the parental relationship and had sought counseling on the subject, the hostility he had expressed toward his father did not rise to the level of clear and extreme conduct warranting termination of child support. *Id.* We mentioned that a child might be expected to experience bitterness toward his father because he had taken actions including trying to cut off all financial support for the child. *Id.* at 550.

¶42. Case law subsequent to *Caldwell* established that termination of child support has been allowed only in egregious situations. In *Roberts v. Brown*, 805 So. 2d 649, 654 (Miss. Ct. App. 2002), the Court of Appeals reversed the chancellor's decision not to terminate child support. In that case, a teenage daughter had falsely accused her father of rape, leading to criminal charges followed by his acquittal of the crime. *Id.* at 651. In addition to the false accusation of a serious felony, the daughter had abandoned the father-child relationship. She had not seen her father for five years and refused to see him. *Id.* at 650. The Court of Appeals found that "the case before us is the case envisioned by the *Caldwell* court," holding that the daughter's conduct was clear and extreme, justifying termination of the father's child support obligation. *Id.* at 653-54. In *Stasney v. Wages*, 116 So. 3d 195, 196 (Miss. Ct. App. 2013), the Court of Appeals affirmed the chancellor's decision that a daughter's refusal to see her

father for two years and her joinder in her mother's petition to terminate his parental rights warranted termination of child support.

¶43.  In *Copeland v. Copeland*, 235 So. 3d 91, 94 (Miss. 2017), this Court affirmed the chancellor's termination of a father's child support obligation based on the children's repeated sending of vicious text messages and emails to their father expressing hatred and their wish that he were dead and their refusal to repudiate the texts and emails at trial. The chancellor had found that "the relationship between father and children has deteriorated to a point unlike this court has seen." *Id.* (internal quotation marks omitted). The chancery court had ruled that, if the relationship were healed in the future, then child support could be revisited. *Id.*

¶44.  The preceding cases provide examples of conduct by a child that is so clear and extreme that it warrants termination of the parental child support obligation under the *Caldwell* standard. Other cases involved conduct that failed to meet that elevated standard. In *Department of Human Services v. Marshall*, 859 So. 2d 387, 388-89  (Miss. 2003), a father who had lost contact with his son but later reestablished it requested termination of child support after two visits with his son. According to the father, the first visit was "a great time." *Id.* at 388. But at the second visit, the child displayed disdain for his father.  *Id.* at 389. The chancellor terminated child support. *Id.* This Court reversed, finding that "[o]ne bad visit between a son that has seen his father twice after many years apart does not rise to the level of clear and extreme conduct envisioned by *Caldwell*." *Id.* at 390. The Court said that "some unpleasantness coming from a child who has had no relationship with his father and when

the father has been behind in his child support payments" was to be expected. *Id.*

¶45.   *Dennis v. Dennis*, 234 So. 3d 371, 373 (Miss. 2017), involved a step-great-grandfather, Thomas Dennis, who was under an order to pay child support to his step-great-grandson. He filed a motion to terminate child support because the child refused to see him or speak with him. *Id.* The chancellor denied relief, noting that the child was twelve years old and "not old enough to appreciate that [the] failure to have a relationship with Mr. Dennis is legally significant." *Id.* at 374. This Court affirmed, finding that the child's actions did not meet the "clear and extreme" standard established by *Caldwell*. *Id.* at 378. We noted that, although the child did not want a relationship with Dennis, he was only twelve years old and, when he was younger, Dennis had told him he was happy that his grandmother was dead. *Id.* at 374. Because that comment showed that Dennis had contributed to the child's estrangement, the Court found no abuse of discretion in the chancellor's refusal to allow Dennis to benefit from his role in causing the estrangement. *Id.* at 378. The Court affirmed the chancellor's denial of Dennis's motion to terminate child support. *Id.*

¶46.   In *Dykes v. McMurry*, 938 So. 2d 330 (Miss. Ct. App. 2006), the Court of Appeals had before it facts very similar to those in today's case. James Dykes filed a petition for modification of custody and to terminate his child support obligation to his son, Kee, alleging that Kee wanted no relationship with him. *Id.* at 332. The chancellor denied relief, noting that Dykes's competing requests for custody of Kee and to terminate Kee's child support were "somewhat contradictory." *Id.* at 334. On review, the Court of Appeals described the problems between Kee and his father as follows:

20

Kee testified that he stopped visiting his father because he was hurt by the lawsuit against his mother and by his father's petition to terminate child support. Kee specifically testified that he still loved his father but does "not want anything to do with him." Kee testified that the relationship between him and his father "is finished." Kee testified that his father does not come to any of his games or school functions. Kee further testified that his father had not called his house to speak to him or made any special effort to sit down and talk with him. Kee specifically testified that he was hurt by his father's allegations in his petition that he and his brothers had been verbally abused and needed counseling. Kee indicated that his father's complaint that Kee never calls his father is one-sided: "he could have called me too."

*Id.* at 333-34.

¶47.    The Court of Appeals affirmed the chancellor's finding that Kee's actions did not meet the "clear and extreme" standard from *Caldwell*. *Id.* at 334. The Court of Appeals emphasized that "[w]hile Kee has indicated that he wants nothing more to do with his father, his affirmation of love for his father indicates that his rejection of the father-son relationship is not entirely clear." *Id.* Because Kee never expressed hatred for his father but instead testified that he loved his father, it was "conceivable that the relationship between Kee and [Dykes] can be repaired." *Id.* The Court of Appeals also relied on the facts that Dykes had not attended Kee's school functions and that Kee had been hurt by the legal battle between his parents as well as his father's efforts to terminate child support. *Id.* The Court of Appeals found that, given the facts, "Kee's current unhappiness with his father is not 'extreme.'" *Id.*

> C.    *The chancellor abused his discretion by terminating Henderson's child support obligation to C.R.H.*

¶48.    *Caldwell* established a high standard for when a parent's child support obligation may be terminated based on the actions of the child, and rightly so. A parent's financial responsibility to his or her child stems from the natural responsibility the parent bears for

21

having brought that child into the world. As *Caldwell* clarified, a parent's financial responsibility is not dependent on the love shown by the child but aligns with the best interests of the child. *Caldwell*, 579 So. 2d at 548. *Caldwell* established that, in the ordinary case, child support in no way depends on the child's receptivity to a relationship with the payor parent. *Id.* This Court never has held that child support is a payment to the child in consideration of visitation. Only when a child's conduct is so egregious that it constitutes a clear and extreme abandonment of the parent-child relationship should child support be terminated. *Id.*

¶49. Our standard of review is highly deferential to the chancellor, *Copeland*, 235 So. 3d at 96, but it is not blindly deferential. This Court "will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong . . . ." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (Miss. 2009) (citing *Owen v. Owen*, 928 So. 2d 156, 160 (Miss. 2006)). I would hold that the chancellor manifestly erred by finding that the conduct of C.R.H. in rejecting a relationship with his father was clear and extreme under *Caldwell*. C.R.H. expressed love for his father and was participating in weekly parental reunification counseling with him. He thought the relationship could improve if his father attended his band performances or if he, C.R.H., initiated a conversation with his father. The parental reunification counselor thought that the relationship was not a lost cause. In *Caldwell*, this Court found that the child's actions were not clear and extreme because the child was participating in counseling regarding the parental relationship. *Id.* at 548. In *Dykes*, the Court of Appeals found that a child's expression of love for his father meant that the child's rejection of the relationship was not clear. *Dykes*,

938 So. 2d at 334. No one testified that C.R.H. cursed or disparaged his father as in *Copeland*. Nor did C.R.H. desire termination of Henderson's parental rights or falsely accuse him of a felony as in *Stasney* and *Roberts*.

¶50. Further, some of C.R.H.'s hostility toward his father was due to years of ongoing custody litigation. C.R.H. knew that his father sought termination of child support. *Caldwell* found that a child can be expected to harbor bitterness toward a parent who is trying to cut off financial support. *Id.* at 550. Moreover, both parents admitted that they bore some responsibility for C.R.H.'s estrangement from Henderson. Testimony from Henderson, Davis, and the children established that Davis had disparaged Henderson in the presence of the children. And testimony supported Henderson's own assessment that he bore some responsibility. C.R.H.'s reluctance to visit his father began when he was approximately ten years old. When he was twelve, an incident occurred at his father's house that engendered an investigation by DHS due to visible marks on L.S.H.'s neck. C.R.H. testified that he witnessed his father violently grab his brother by the neck and, according to C.R.H., on that occasion, his father made him hold his hands to the wall until his arms hurt. After that incident, C.R.H. testified, he decided not to go to visitation at all. Therefore, the record reflects that C.R.H.'s hostility toward his father was formed at a young age. Although that attitude reasonably might have been expected to have dissipated by the time C.R.H. reached the age of seventeen, the law should not hold a minor child financially responsible for harboring an unreasonable attitude forged in the volatility of ongoing custody litigation between two vindictive parents.

¶51. I observe that the chancellor did not mention that C.R.H. was in parental reunification counseling although he found that L.S.H.'s participation in the same counseling was grounds to uphold L.S.H.'s child support. The only distinguishing factor between L.S.H. and C.R.H. was that L.S.H. expressed willingness to have a relationship with his father and that he went out to dinner with him; but those dinners were few and far between, and, like C.R.H., he was totally unwilling to return to overnight visitation. In light of the fact that C.R.H. also was in parental reunification counseling to improve his relationship with his father, a fact that the chancellor may have overlooked, the chancellor's reasons for distinguishing between the two boys were not substantial.

¶52. I would find that the chancellor manifestly erred by finding that C.R.H.'s actions were clear and extreme. First, it is unclear that C.R.H. has rejected a relationship with his father because, although he said he does not want to resume visitation, he participates in weekly parental reunification counseling with his father, he said that he loves his father, he proposed two ideas for how the relationship could go forward, and the counselor expressed hope for the relationship. Second, because C.R.H. knew of his father's attempt to cut off child support, both parents had an admitted role in the estrangement, and while Henderson perpetrated arguably abusive conduct toward C.R.H. and his brother when they were younger, it cannot be said that C.R.H.'s attitude toward his father was extreme.

¶53. In conclusion, the child support obligation reflects the natural responsibility of the parent toward the minor child, not the other way around. In this case, both parents were physicians with substantial monthly incomes. Henderson testified that the $2,000 per month

he paid for the boys' support was "silly money" and that his motivation for attempting to cut off child support had "nothing to do with the boys," but it was to "make [Davis] do what she is suppose[d] to do." One parent's desire to coerce or punish the other parent is not a proper basis for requesting termination of child support. "The proper inquiry . . . is what is in the best interest of the child." *Caldwell*, 579 So. 2d at 548. Regardless of whether the amount of child support was significant to the parties in this case, our decision today will have consequences for the vast majority of such cases in which the money really matters. Because child welfare is at stake, this Court should reserve termination of child support based on an abandonment of the parent-child relationship only for those cases in which the child's actions truly are clear and extreme. Because the evidence did not establish substantially that C.R.H.'s actions were a clear and extreme abandonment of his relationship with Henderson, I would affirm the decision of the Court of Appeals that reversed the chancellor's decision terminating child support.

**KING, P.J., JOINS THIS OPINION.**

**COLEMAN, JUSTICE, DISSENTING:**

¶54.    In *Dennis v. Dennis*, 234 So 3d 371, 378 (Miss. 2017), the Mississippi Supreme Court wrote that it would be "unjust" to allow one obligated to pay child support to create a rift in his relationship with a child that, in turn, releases the obligor from paying child support. *See also Polk v. Polk*, 589 So. 2d 123, 130-131 (Miss. 1991) (considering negative actions of father toward child when reversing chancellor's decision to relieve father of payment obligations to child).  Counsel for Davis presented the above-described legal

principle to the chancellor at the close of the trial in March 2019 that led to the order now on appeal. As described by the Court of Appeals, the chancellor also heard evidence that Henderson's behavior caused the rift between him and his minor child. ***Davis v. Henderson***, No. 2018-CA-01184, 2020 WL 5793021, at *2-3 (Miss. Ct. App. Sept. 29, 2020). However, the final judgment does not indicate that the chancellor considered the rule. We review issues of law *de novo*. ***In re Johnson***, 312 So. 3d 709, 711 (Miss. 2021) (citing ***Venture Sales, LLC v. Perkins***, 86 So. 3d 910, 913 (Miss. 2012)). Because the record in the case indicates that the chancellor failed, in conformance with the correct legal principle set forth above, to consider evidence that Henderson caused the breach between himself and his minor child, I would, with respect, reverse the judgment of the chancellor on the issue and remand the case for further proceedings.